**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ESTEFANY MARTINEZ,

    Plaintiff,

v.

AMAZON.COM SERVICES
LLC,

    Defendant.

\*

\*

\*

\*

\*

\*

Civil No. 22-00502-BAH

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Estefany Martinez ("Plaintiff") brings this action against Amazon.com Services LLC ("Amazon" or "Defendant"), alleging on a class wide basis, that she and putative class members have worked compensable time under Maryland law for Defendant for which they have not been paid. ECF 4 (Joint Stipulation) ¶ 1; *see* ECF 5, at 1–2 ¶¶ 1–3 (Complaint). Pending before the Court are two motions: (1) Plaintiff's Motion for Class Certification ("Plaintiff's Motion"), ECF 44, and (2) Defendant's Motion for Summary Judgment ("Defendant's Motion"), ECF 43. Both parties filed oppositions to their opponents' motions, ECF 50 (Defendant's response in opposition to Plaintiff's Motion); ECF 51 (Plaintiff's response in opposition to Defendant's Motion), and both parties filed replies. *See* ECF 58 (Plaintiff's reply to Defendant's opposition to Plaintiff's Motion); ECF 59 (Defendant's reply to Plaintiff's opposition of Defendant's Motion). All filings include memoranda of law and exhibits.[1] The Court has reviewed all relevant filings, including Plaintiff's notices of supplemental authority, ECFs 60, 62, 66, 70, and Defendant's

---

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

responses, ECFs 64, 65, 67, and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Plaintiff's Motion, ECF 44, is **GRANTED**. The question of whether a *de minimis* exception exists for claims under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law is **CERTIFIED** to the Supreme Court of Maryland. The Court reserves decision on Defendant's summary judgment motion, ECF 43, until the state court resolves the *de minimis* question of law.

## I.    **BACKGROUND**

Plaintiff, a former warehouse employee of Amazon, seeks certification of this lawsuit as a class action on behalf of all individuals who, between November 18, 2018, and March 31, 2020, were employed by Defendant as hourly non-exempt workers at its BWI2 (2010 Broening Highway, Baltimore, MD 21224), DCA1 (1700 Sparrows Point Boulevard, Sparrows Point, MD 21219), and MDT2 (600 Principio Parkway West, North East, MD 21901) Maryland fulfillment centers. ECF 44-1, at 7. Plaintiff challenges the legality of standardized pay policies that Amazon has imposed on all putative class members under the Maryland Wage Payment and Collection Law ("MWPCL"), the Maryland Wage and Hour Law ("MWHL") (collectively "Maryland Wage Laws"), and under the doctrine of unjust enrichment. ECF 5, at 7–9.

Specifically, Plaintiff challenges Amazon's practice of requiring mandatory security screenings at the end of each workday while failing to compensate employees for the time associated with the screening, such as "time spent waiting in security lines and going through the security screening process." *Id.* at 3–4 ¶¶ 15–16. It is undisputed that Defendant did not compensate workers for this time. *See* ECF 21 (Answer) at ¶¶ 2, 16, 27–28, 38. Rather, Amazon asserts that this time is simply not compensable under Maryland Wage Laws. *Id.*

2

### A.    Factual Background

Plaintiff is a former Amazon employee who worked as a Fulfillment Associate between June 20, 2017, and November 12, 2021, at the Baltimore Fulfillment Center ("BWI2").[2] ECF 21, at 3 ¶ 13. Specifically, Plaintiff worked as "packer" on the facility floor, where she sealed boxes and put them on a conveyor belt. ECF 43-3, at 4–5, 15:12–16:15.

Up until April 2020, Plaintiff and most other hourly Maryland fulfillment center employees were required to clock out at the end of the day before beginning the required post-shift security screening process. ECF 50, at 9; ECF 51-1 ("Gilbert-Differ Dep."), at 5, at 81:3-18 (indicating security screening stopped during April 2020); *id.* at 121:1–6 ("Certain associates would be granted an exemption from screening. These were case by case, but most commonly associated with medical conditions.").

---

[2] The parties stipulated that the relevant time period for the claims in this action are from the beginning of the limitations period "through and until when security screening was turned off at Amazon's Maryland fulfillment centers because of the COVID pandemic," in April of 2020. ECF 43-1, at 4 n.1; ECF 51, at 6 n.3.

Defendant states the limitation period in this case is three years before the Complaint was filed, making the "start date" December 2, 2018. ECF 43-1, at 4 n.1 (citing *Butler v. PP&G, Inc.*, Civ. No. 20-3084-JRR, 2023 WL 3580374, at *3, n.7 (D. Md., May 22, 2023)); *see also* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (imposing a three-year statute of limitations for civil actions "unless another provision of the Code provides a different period").

Plaintiff states the correct statutory time period is three years and two weeks, making the "start date" November 18, 2018. ECF 51, at 6 n.3 (citing generally to the "MWPCL statute of limitations"); *see also* LE § 3-507.2 (indicating a cause of action under the MWPCL accrues two weeks after the employer should have paid the wage); *Butler v. VisionAIR, Inc.*, 385 F. Supp. 2d 549, 554 (D. Md. 2005) (holding that "a claim under the MWPC[L] must be filed within three years and two weeks from date on which employer should have paid wage"); *Higgins v. Food Lion, Inc.*, 197 F. Supp. 2d 364 (D. Md. 2002) (noting the Court held the statute of limitations period was three years and two weeks before the filing of the complaint). Accordingly, the applicable statute of limitation is three years and two weeks for Plaintiff's MWPCL claim, and three years for Plaintiff's other claims.

3

1.    Lockers and Storage Area

Amazon employees arriving to begin their shift had the option to store their personal belongings in lockers before entering the secured area of the fulfillment floor. *See* ECF 43-4, at 22, 147:4–12 (describing options for storage of personal items, including refrigerators, lockers, or personal vehicles). Plaintiff did not use the locker because she did not "know how to use it." *See* ECF 51-3, at 5, 46:12–16. ("I had a locker, like I said. I didn't know how to use it because it had like a padlock on it, and it had a combination like they gave me on a piece of paper in order to open it, but I didn't know how to open it.").

Employees had the option to not use the lockers and to carry their personal items onto the warehouse floor. *See* ECF 43-3, at 19, 83:16–20 (indicating Plaintiff chose to bring a backpack into the work area). Amazon did not require any personal items for work in the secured area, so no personal items were necessary for work functions. *Id.* at 19–20, 83:22–84:10 (responding "it wasn't necessary but I did," when asked if bringing a bag was needed to perform the work and affirming that Plaintiff chose to bring a backpack into the work area).

2.    The Security Screening Process

From November 2018 through April 2020, ECF 43-4, at 12, 81:13–18 (noting the cessation of security screenings in April 2020), employees who exited fulfillment centers passed through a security area on their way out of the building. *Id.* Plaintiff's work location, BWI2, had two exits, an east and west exit. ECF 43-3, at 7–8, 30:7–31:21 (indicating Plaintiff usually used the east exit). Security screening at each of BWI2's exits consisted of metal detectors arranged in a row. ECF 43-3, at 34–38 (photographs of metal detectors). Employees clocked out before passing through the security screening areas at all three facilities and thus were not compensated for the time spent in the screening areas. ECF 50, at 9.

Employees had three options for passing through the metal detectors, depending upon the items on their person. They could travel through: (1) an "express lane," which employees could use if they chose not to bring any items onto the floor that would trigger the metal detector, ECF 43-4, at 15, 120:6–10; (2) a "divestment lane," where employees could slide items that would trigger the metal detector down a table for visual inspection and then pass through the metal detector, ECF 43-3, at 24, 91:3–22; ECF 43-4, at 18, 142:14–143:7; and (3) a bag scan lane, where employees could place a bag on a conveyor belt and have it scanned while the employee walked through the metal detector. *Id.* at 13, 97:12–19.

The undisputed testimony is that a line would form in the bag-check lanes with x-ray devices. ECF 51-1, at 7–9, 94:21–96:16 ("The area where a line would likely form is actually at the x-ray device."); *id.* at 9, 96:11–16 ("The reason that you would have a line at the x-ray device is because it has the capacity to process one bin, one bag at a time, and therefore, a line would form as individuals placed their bags usually into a bin ready to push through the x-ray device."). Plaintiff reports that there were sometimes approximately 20 people in line ahead of her in the bag-check lane. ECF 43-3, at 21, 88:2–3.

Whether and to what extent a line would form in the divestment lane or the express lane is unclear. Plaintiff testifies that "even in the express lane, there would be several people lined up." *Id.* at 88:8–11. Geoffrey Gilbert-Differ (Senior Regional Loss Prevention Manager), ECF 51-4, at 5, indicated that he only observed lines accrue in the bag-check lanes with x-ray devices. ECF 51-1, at 7–8, 94:21–95:21; *id.* at 22, 143:11–14 ("An express lane is really intended to be purely something someone could walk through. Virtually you are making no stops or taking no actions.").

Plaintiff never used the express lane. ECF 43-3, at 22, 89:18–21. Plaintiff occasionally used the divestment lane when she did not have her bag. *Id.* at 24, 91:8–15. If someone set off

the metal detector, Plaintiff noted that the person who set off the metal detector would then be subjected to secondary screening with a magnetic wand. *See* ECF 43-3, at 25, 92:22–93:3 (indicating Plaintiff triggered the metal detector "about twice"); *id.* at 26, 93:20–22 (stating that someone from security waved a metal detector wand in front of Plaintiff and behind her for "maybe three" seconds as part of the secondary screening). Additionally, to cut down on the need for secondary screenings, all employees were instructed to not bring metal into the secured area to the extent possible. ECF 43-3, at 27, 96:4–20.

### 3.   Time Punch Data Comparisons to Exit Swipe Data

There is no way to definitively know how long employees waited in line, however Amazon did collect two forms of time-related data, "time clock punch data" and "exit swipe data," which may permit some inferences. *See* ECF 43-5 (Decl. of Peter Nickerson), at 2 ¶¶ 4–5. "Time clock punch data" reflects the time at which the employee finished their shift and clocked out at a time clock within the secured area. *Id.* ¶ 4. "Exit swipe data" refers to the time at which the employee swiped their badge at a turnstile in order to exit the facility after completing security. *Id.* ¶ 5.

The difference between the punch time and exit swipe does not necessarily capture the time the employee spent waiting in a security line, however, because if, "on any given day an employee conducted any other activities after punching out at a time clock—such as using the restroom, going to the employee's locker, visiting a break room, or chatting with another employee, etc.," then the difference between the employee's clock out time and exit swipe time would not, according to Defendant, provide an accurate measurement of the time the employee spent waiting in a security line. *Id.* ¶ 6. Additionally, "[e]ven if the employee went straight from security to the exit turnstile, the difference between clock out and exit swipe time would still exceed the time spent passing through security because that difference would also include the employee's time spent walking to an exit turnstile." *Id.*

Amazon provided this time clock and exit swipe data to Peter Nickerson, an economist at Nickerson & Associates, LLC, a consulting firm specializing in economic and statistical analysis. *Id.* at 1 ¶ 2; *see id.* ¶ 3 (indicating Amazon provided 947,800 rows of time clock punch data and 1,235,356 rows of exit swipe data for the period of December 1, 2018, through May 21, 2019). Mr. Nickerson determined that Plaintiff worked a total of 68 shifts during the relevant period of time, and for 20 of those shifts (29.4% of shifts), it took three minutes or less after clocking out for Plaintiff to exit the facility through the exit turnstile. *Id.* at 2 ¶ 7. For 28 of the remaining 48 shifts (41.2% of shifts), she took between three to five minutes from clocking out to reach the exit turnstile. *Id.* For 11 of the remaining 20 shifts (16.2% of shifts), Plaintiff took between five and eight minutes to exit after clocking out. *Id.* For 6 shifts (8.8% of shifts), Plaintiff took 15 minutes or more to exit after clocking out.[3] *Id.*

In total, it took Plaintiff more than 5 minutes to exit after clocking out on 20 occasions. ECF 43-5, at 3 ¶ 8. During these 20 shifts, a different employee punching out within one minute of Plaintiff, and at the same time clock, made it to the exit turnstiles in three minutes or less on at least 214 occasions. *Id.* ¶ 9. Defendant alleges that this "data undercuts any claim by Plaintiff that there were delays going through security." ECF 43-1, at 10.

Plaintiff's counsel retained Liesl Fox, a Senior Consultant and Partner at Quantitative Research Associates, to create "a damages model and report for Plaintiff that calculates the value of the wages associated with the time between when she stopped getting paid each day and when she swiped out to exit the facility after completing the post-shift security screening process." ECF 44-1, at 16; ECF 44-9, at 2. Based on the data provided, Ms. Fox concluded that Plaintiff

---

[3] The Court notes that Mr. Nickerson indicated that Plaintiff worked a total of 68 shifts, but only 65 shifts are analyzed. 3 shifts are unaccounted for in the analysis.

"experienced a total 9.61 Paid-to-Exit Time Lag hours during the period from November 18, 2018 through May 20, 2019, of which 1.95 exceeded the 40-hour per week overtime threshold" and thus Plaintiff "would be owed a total of $161.65."[4]  *Id.* at 3. Ms. Fox indicated that "if similar data files were produced for additional employees who worked at Amazon fulfillment centers in Maryland, the same analysis used to prepare this report could be applied to the new data files on a class-wide basis." *Id.*

## B.    Procedural History

Plaintiff filed this case on December 2, 2021, on behalf of herself and the putative class in the Circuit Court for Baltimore City. ECF 1, at 1 ¶ 1 (citing ECF 5). Defendant filed a Notice of Removal pursuant to 42 U.S.C. § 1441(a). ECF 1, at 3 ¶ 11. Though Plaintiff has alleged only state law causes of action, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), as codified in relevant part at 28 U.S.C. § 1332(d)(2). CAFA allows for federal subject matter jurisdiction over any civil class actions in which: (a) any member of a class of plaintiffs is a citizen of a State different from any defendant; (b) the aggregate number of putative class members in all proposed plaintiff classes is at least 100; and (c) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2)(A) and 1332(d)(5). *See* ECF 1, at 4–12 (outlining basis for jurisdiction).

This case was stayed pending the outcome of two cases before the Supreme Court of Maryland: *Amaya, et al. v. DGS Construction, LLC, et al.*, 278 A.3d 1216 (Md. 2022) ("*Amaya*"), and *Rojas, et al. v. F.R. General Contractors, Inc., et al.*, 255 A.3d 1091 (Md. 2021) ("*Rojas*")

---

[4] The records produced indicate that Plaintiff was on leave during the pay periods from May 26, 2019 through May 9, 2020. ECF 44-9, at 3, n. 2. Time records were produced through May 20, 2019. *Id.*

(consolidated with *Amaya* on grant of writ of certiorari). *See* ECF 4, at 1 ¶¶ 2–3 (Consent Motion to Stay proceedings); ECF 8 (granting parties' Motion to Stay).

On October 4, 2022, Judge Griggsby lifted the stay. *See* ECF 11; ECF 10 (requesting the Court lift the stay). Thereafter, Defendant filed its Answer, ECF 21, and the parties engaged in discovery, which included depositions and the exchange of written discovery. *See* ECF 56 (indicating completed portions of the Court's Scheduling Order). Defendant filed a Motion for Summary Judgment on November 21, 2023. *See* ECF 43. On the same date, Plaintiff filed her Motion for Class Certification. *See* ECF 44.

## II.   **LEGAL STANDARD**

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). Plaintiff, as the party seeking certification, bears the burden of establishing the requirements of Rule 23. *Int'l Woodworkers of Am. v. Chesapeake Bay Plywood Corp.*, 659 F.2d 1259, 1267 (4th Cir. 1981).

Under Rule 23(a), plaintiff bears the burden to show "that the prospective class compl[ies] with four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation." *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (citing Fed. R. Civ. P. 23(a)); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 423 (4th Cir. 2003). In addition, plaintiff must show "the class action [] fall[s] within one of the three categories enumerated in Rule 23(b)." *EQT Prod. Co.*, 764 F.3d at 357 (quoting *Gunnells*, 348 F.3d at 423).

Here, Plaintiff seeks certification under Rule 23(b)(3). *See* ECF 44-1, at 23–32 (advancing "predominance" and "superiority" arguments under Rule 23(b)(3)). Certification under Rule 23(b)(3) is appropriate when all of the prerequisites under Rule 23(a) are satisfied, and two

additional requirements are met. *EQT Prod. Co.*, 764 F.3d at 357 (citing *Wal-Mart Stores Inc. v. Dukes,* 564 U.S. 338, 362 (2011)). Specifically, plaintiff must prove that (1) common questions of law or fact predominate over any questions affecting only individual class members; and (2) proceeding as a class is superior to other available methods for adjudicating the controversy. *See* Fed. R. Civ. P. 23(b)(3).

In meeting the burden, a plaintiff must present evidence that the putative class complies with Rule 23. *EQT Prod. Co.*, 764 F.3d at 357 (citation omitted). A district court, in assessing whether the burden has been met, may be required to "probe behind the pleadings before coming to rest on the certification question." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted). Certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id.* (citation omitted); *see also Wal-Mart*, 564 U.S. at 350–51. Rule 23 does not grant courts "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Rather, merits questions may be considered "only to the extent [] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citation omitted).

## III.    ANALYSIS

Plaintiff seeks certification of this lawsuit as a class action on behalf of all putative class members who, between November 18, 2018, and March 31, 2020, were employed by Amazon as hourly non-exempt workers at its BWI2 (2010 Broening Highway, Baltimore, MD 21224), DCA1 (1700 Sparrows Point Boulevard, Sparrows Point, MD 21219), and MDT2 (600 Principio Parkway West, North East, MD 21901) Maryland fulfillment centers. ECF 5, at 4 ¶ 18; ECF 44-1, at 7 (asserting "this lawsuit is especially well-suited for class-wide resolution"). Defendant primarily

10

argues that Plaintiff has failed to satisfy the commonality, typicality, predominance, and superiority requirements for class certification. *See* ECF 50, at 13, 28, 30.

### A.    Class Certification Requirements

The Court turns to the Rule 23 class certification requirements and finds that they are met here.

#### 1.    Ascertainability

As a threshold matter, "the class must exist and be 'readily identifiable' or 'ascertainable' by the court through 'objective criteria.'" *Amaya v. DGS Construction, LLC*, 326 F.R.D. 439, 446 (D. Md. 2018) (citing *EQT Prod. Co.*, 764 F.3d at 358). Plaintiff contends that Defendant's company payroll records clearly establish who was employed by Defendant as an hourly, non-exempt employee at the three Maryland fulfillment centers during the relevant time period. ECF 44-1, at 19. Defendant asserts that "there are no ascertainable subclasses, even if broken down by facility, as the same employee may have chosen to use different lanes on different days . . . and there is no consistent characterization of their screening experiences, nor any record of the frequency at which they used each lane." ECF 50, at 27. For the reasons discussed *infra*, at Section 6, subclasses are not necessary to answer the questions of law and fact that predominate over the class. Furthermore, the Court finds that Amazon's uniform post-shift security screening policy obviates the need for subclasses. Defendant has already indicated, based on a "preliminary review of [Amazon's] records," that Defendant employed more than 6,000 non-exempt hourly employees at its BW12 facility from December 2, 2018, through March 1, 2020. *See* ECF 1-8 (Decl. of Kimberly Richardson), at 2 ¶ 4. Thus, the Court agrees with Plaintiff that "[b]ecause such information is stored electronically and based on objective criteria, the members of the class will be ascertainable without significant administrative burden." ECF 44-1, at 19 (citing *Robinson v. Nationstar Mortgage, LLC*, Civ. No. TDC-14-3667, 2019 WL 4261696, at *17 (D. Md. Sept. 9,

2019)); *see also Amaya*, 326 F.R.D. at 448 (finding class ascertainable where individuals could be

identified from the employer's payroll records without significant administrative burden).

### 2.    Numerosity

The proposed class definition encompasses approximately 23,914 current and former

employees. *See* ECF 44-1, at 20; ECF 50, at 11. Defendant does not contest that Plaintiff has

demonstrated the numerosity required by Rule 23(a)(1). Indeed, these numbers are plainly

sufficient to satisfy numerosity, as joinder of this many individuals would be impracticable. Fed.

R. Civ. P. 23(a)(1); *In re Under Armour Securities Litigation*, 631 F. Supp. 3d 285, 300 (D. Md.

2022) ("[G]enerally, courts find classes of at least 40 members sufficiently large to satisfy the

impracticability requirement[.]") (citing *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 497

(D. Md. 1998)). As such, Rule 23(a)(1)'s requirement of "numerosity" is easily satisfied.

### 3.    Commonality

The "commonality" requirement asks whether "questions of law or fact [are] common to

the class." Fed R. Civ. P. 23(a)(2). This common question of law or fact must "be of such a nature

that it is capable of classwide resolution—which means that determination of its truth or falsity

will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-*

*Mart*, 564 U.S. at 350. "Minor differences in the underlying facts of individual class members'

cases do not defeat a showing of commonality where there are common questions of law," *Hewlett*

*v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997), so long as the "common question

is one that can be resolved for each class member in a single hearing." *Thorn v. Jefferson-Pilot*

*Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Here, Plaintiff has identified common policies that allegedly resulted in unpaid wages for

class members, specifically: (i) by requiring all class members to undergo post-shift security

screenings within the facilities; (ii) by requiring all class members to clock out for pay purposes

12

prior to the post-shift security screening process; and (iii) by rounding class members' pay to the

end of their scheduled shift if they clock-out within five minutes of the end of their scheduled shift.

ECF 44-1, at 28. Based on these policies, which undisputedly applied to all employees (except for

employees with medical exemptions), Plaintiff has identified at least three common questions of

law: (1) whether time undergoing post-shift security screenings is compensable "hours of work"

under Maryland Wage Laws[5]; (2) whether Maryland Wage Laws have a *de minimis* exception and

if so, does it apply to the time at issue in this case; and 3) whether the Maryland Wage Laws

provide for the recovery of unpaid "straight time" hours under 40 in a week at the Maryland

minimum wage or the worker's regular hourly rate of pay.[6] ECF 58, at 9–11. The legal questions

presented are "capable of classwide resolution" without consideration of exactly how much time

any plaintiff spent in a security line on any given day. *See Wal-Mart*, 564 U.S. at 350. The first

common question concerns "the proper scope of COMAR'S 'hours of work.'" ECF 58, at 9. The

second common question asks whether a *de minimis* exception exists under Maryland Wage Law

and if it applies to these claims. *Id.* at 10. The third common question focuses on the standard by

which damages should be calculated under Maryland Wage Laws. *Id.* at 11. The Court need not

evaluate any "individualized" or plaintiff-specific facts to decide these questions. Accordingly,

the Court is satisfied that determining liability will not "turn on thousands of mini-trials regarding

what level of screening occurred and who was responsible for that screening." ECF 50, at 17.

---

[5] The inquiry post-*Amaya* focuses on whether, pursuant to COMAR 09.12.41.10A, Amazon required the employee to be "on duty, on the premises, or at a prescribed workplace" during the post-shift security screening. *Amaya*, 278 A.3d at 1249.

[6] Defendant argues that "Maryland law only requires that Plaintiff is owed the minimum wage for non-overtime or 'straight' time violations," rather than Plaintiff's regular pay. ECF 50, at 19 (citing Md. Code Ann., Lab. & Empl. § 3-413). Plaintiff, on the other hand, maintains that she is entitled to her "full regular hourly rate of pay" for "straight time" violations. ECF 58, at 11 n. 9 (citing the MWPCL's definition of wages).

Rather, the common issues can be resolved in "one stroke" for each class member. The fact that damages may vary among class members does not change the analysis. *See infra* Section 6.

Moreover, Plaintiff need not demonstrate at this stage that the claims are meritorious; it is sufficient that Plaintiff raises common issues of legal viability under the Maryland Wage Laws. *See, e.g., Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."); *Lassen v. Hoyt Livery Inc.*, No. 13-cv-1529, 2014 WL 4638860, at \*9 (D. Conn. Sept. 17, 2014) ("It is the legality or illegality of that unvarying [compensation] policy that provides the unifying thread to satisfy the commonality requirement."); *see also Davis v. Target Corp.*, Civ. No. 23-89, 2023 WL 8373162, at \*3 (E.D. Pa. Dec. 1, 2023) (commonality met where "class members share the important common question of whether time spent walking from the building entrance to the time clocks and back again is compensable" under Pennsylvania's Minimum Wage Act). Accordingly, there are several questions of law common to the class.

### 4. Typicality

Next, the Court finds that the "typicality" requirement is satisfied. The class representative's claims and defenses must be "typical of the claims or defenses of the class" in that prosecution of the claim will "simultaneously tend to advance the interests of the absent class members." Fed. R. Civ. P. 23(a)(3); *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006). The plaintiff's claim "cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim." *Id.* at 466–67. "In analyzing this question, a court compares the class representative's claims and defenses to those of the absent class members, considers the facts needed to prove the class representative's claims, and assesses the extent to which those facts would also prove the claims of the absent class

14

members." *Amaya*, 326 F.R.D. at 447 (citing *Deiter*, 436 F.3d at 466–67). Typicality does not require that plaintiff's claim and the claims of class members be "perfectly identical" or "perfectly aligned," but the Court is guided by the notion, "as goes the claim of the named Plaintiff, so go the claims of the class." *Souter v. Equifax Info. Servs, LLC*, 307 F.R.D. 183, 208 (E.D. Va. 2015) (citing *Deiter*, 436 F.3d at 466–67).

Plaintiff argues that "[s]o long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied." ECF 44-1, at 21–22 (citing *Hewlett*, 185 F.R.D. at 217. Additionally, Plaintiff notes that "a plaintiff's claim may differ factually and still be 'typical' of the claims of class members if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." ECF 44-1, at 22 (citing *Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556, 560 (D. Md. 2002)). As relevant here, Plaintiff avers that her legal theory that "class members should be paid for unpaid time resulting from [] Amazon's common policy of requiring class members to clock-out for pay purposes prior to going through mandatory post-shift security screenings before exiting the facility [] is entirely aligned with the interests of other class members." ECF 44-1, at 22.

Defendant argues that Plaintiff is not a proper representative as (1) she cannot represent employees at Amazon facilities where she did not work, ECF 50, at 28–30; and (2) Plaintiff's time spent passing through security involved situations that were unique to her, *id.* at 30. Plaintiff counters that "[d]istrict courts frequently certify similar classes to the ones proposed here by Plaintiff, seeking unpaid wages for time spent performing pre- and post-shift activities." ECF 58, at 11–12 (citing ECF 44-1, at 20–22).

15

The named Plaintiff's claims are typical of those of the class she seeks to represent. Plaintiff was subject to the same policy requiring her to go through security screening after every shift, and she, like all other employees, was not paid for any security wait-time after clocking out. Plaintiff brings the same central claims as her class members despite working at only one of the three fulfillment centers. *See Alfonso v. FedEx Group Package Sys., Inc.*, No. 21-cv-01644, 2024 WL 1007220, at *13 (D. Conn. March 8, 2024) ("[T]he fact that there is not a named plaintiff to represent each of the eight facilities is a 'variation in the fact pattern,' that does not change the fact that Plaintiffs bring the same central claims as their class members in challenging the failure to pay for security and walking time.") (citing *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993) (brackets omitted)).

Defendant asserts that Plaintiff "cannot speak to workers' experiences at the DCA1 and MDT2 facilities, or even to the experience of workers at the BW12 facility who used the express lane." ECF 50, at 29. But the experiences of other employees are consistent with Plaintiff's experience insofar as the putative class members were subject to, and underwent, a uniformly administered security screening process across all three facilities. *See Alfonoso*, 2024 WL 1007220, at *13 (finding typicality prong satisfied even though the named plaintiffs did not work at each of the different Connecticut facilities covered by the certified class because policy of not paying employees for security and walking time was uniform). The declarations submitted by Defendant from different employees across the three facilities sufficiently show that:

- 1) all class members were required to clock out before entering the post-shift security screening. *See, e.g.,* ECF 50-5 (Decl. of Colin Leech), at 2 ¶ 3 ("BW12 [facility] had security checkpoints . . . that employees would go through after clocking out."); ECF 50-10 (Decl. of Brandy Venable), at 2 ¶ 3 ("DCA1 [facility] had a security checkpoint . . . that employees would go through after clocking out at the end of their shifts."); ECF 50-15 (Decl. of Alexander Cunningham), at 2 ¶ 5 ("The time clocks [at MDT2] were . . . before going through security on the way out.");

- 2) the security process was the same across facilities—each facility had an express lane, divestment lane, and bag lane. *See* Decl. of Colin Leech, at 2 ¶¶ 4, 5, 6 (describing an express lane, divestment lane, and bag lane at BW12); ECF 50-13 (Decl. of Tarrence Fossett), at 2 ¶ 4 (describing use of the DCA1 "express lane or divestment lane because [he does not] typically bring bags in"); ECF 50-14 (Decl. of William Jones Jr.), at 2 ¶ 5 ("There are lanes [at DCA1] for employees who carry bags or metal objects. I always used the 'express lane' or 'divestment lane' because I kept my keys, wallet and cellphone in my pocket."); ECF 50-16 (Decl. of Kim Goad), at 2 ¶ 4 (describing "a lane for people carrying bags out of the facility," lanes for "people who had metal objects on them," and an express lane "if you did not have any bags or metal objects with you" at MDT2 facility); ECF 50-18 (Decl. of Sara Sowiak), at 2 ¶ 4 (describing express lanes, divestment lanes, and bag lanes at the MDT2 facility);

- 3) all employees were required to walk through a metal detector before exiting. *See* ECF 50-6 (Decl. or Regina Parol), at 2 ¶ 3 ("All security lanes [at BW12] required people exiting to walk through a metal detector."); ECF 50-8 (Decl of Andrea Alston), at 2 ¶ 4 ("All of the lanes [at DCA1] required employees to walk through a metal detector."); Decl. of Kim Goad, at 2 ¶ 4 ("All of these lanes [at MDT2] required employees to walk through a metal detector.").

- 4) each facility had a secondary screening process in place. *See* Decl. of Regina Parol, at 2 ¶ 6 (describing secondary screening at BW12); ECF 50-12 (Decl. of George Bol), at 2 ¶ 6 (describing secondary screening at DCA1); ECF 50-17 (Decl. of Melissa Renee Whitehead), at 2 ¶ 7 (describing secondary screening at MDT2).

What is more, it is undisputed that Defendant did not compensate employees for the time spent, if any, in security. ECF 50, at 9 (stating the "timeclocks were located shortly before exit security screening at all three facilities"). Here, Plaintiff is advancing an argument that the time spent in post-shift security is compensable, and the core of that claim is that it was impermissible for Defendant to fail to pay employees for this time, regardless of the amount of time in security. The facts and theories underlying Plaintiff's claims thus mirror those of other class members because all employees were subject to unpaid post-shift security screening. *Cf. Trevino v. Golden State FC LLC*, No. 18-cv-120, 2023 WL 3687377, at *15 (E.D. Cal. May 26, 2023) (finding no commonality or predominance where post-shift security screening policy was not enacted uniformly because "there were periods of time in which the screening process was not mandatory, did not occur, or was not applied to all putative class members").

Defendant also contends that "numerous other employees clocking out at the same time" exited in less time than Plaintiff did "demonstrating that Plaintiff's delay, if there was one, was unique to her and did not involve security screening." ECF 50, at 30. But the test for typicality is "whether the facts relied upon by the plaintiffs to prove their claims 'would also prove the claims of the absent class members,' not whether they have suffered the same or greater damages than the average class member." *Amaya*, 326 F.R.D. at 448–49 (citing *Deiter*, 436 F.3d at 466–67). If Plaintiff prevails on the merits, all class members will be entitled to unpaid wages for the time spent in security. It is true that the amount of damages may vary based on the damage calculation for each employee, but it is well-established that individualized damage determinations do not preclude class certification. *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (predominance found "even though other important matters will have to be tried separately, such as damages"); *Gunnells*, 348 F.3d at 427–28 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations."). Accordingly, typicality has been satisfied.

### 5. Adequacy of Representation

The "adequacy" requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." Fed R. Civ. P. 23(a)(4). Adequacy depends on two factors: "(1) whether class counsel are qualified, experienced, and generally able to conduct the proposed litigation; and (2) whether the representative's claims are sufficiently interrelated to and not antagonistic with the class's claims as to ensure fair and adequate representation." *Hewlett*, 185 F.R.D. at 218. The Court finds both adequacy prongs met here.

Plaintiff's counsel is patently qualified. Counsel for Plaintiff has litigated numerous wage lawsuits and has previously been appointed class and/or collective counsel by this Court. *See* ECF

44-1, at 23 (citing *Amaya*, 326 F.R.D. at 448 (explaining that "Plaintiffs' counsel [Joseph,

Greenwald & Laake, P.A.] is experienced in complex civil litigation" and appointing them class

counsel under Rule 23)) and *Edelen v. Am. Residential Servs., LLC*, Civ. No. DKC-11-2744, 2013

WL 3816986, at *3 (D. Md. July 22, 2013) (appointing Joseph, Greenwald & Laake, P.A., and

Winebrake & Santillo, LLC as class counsel) and *Essame v. SSC Laurel Operating Co. LLC*, 847

F. Supp. 2d 821, 822 (D. Md. 2012) (reflecting that both Joseph, Greenwald, & Laake, P.A., and

Winebrake & Santillo, LLC were appointed collective counsel in a federal wage and hour case)).

Defendant does not dispute counsel's qualifications or experience.

Further, there is no conflict between the named Plaintiff and the putative class members

and Plaintiff can fairly and adequately represent the class. Defendant alleges that some employees

report "no wait" time in security," ECF 50, at 30, but the declarations submitted by Defendant

establish that each employee reported some wait time at some point, even if it was minimal, and

thus the putative class's interest in being compensated for that time is sufficiently interrelated to

Plaintiff's chief claim that employees should be compensated for time spent passing through the

security screening area. *See* Decl. of Colin Leech, at 2 ¶ 5, 7 (stating it took 30 to 45 seconds to

go through the checkpoint and secondary screening took up to one to two minutes total); Decl. of

Regina Parol, at 2 ¶¶ 4, 5, 6 (stating security took "a second" in the summer, "close to one minute"

in the winter, and secondary screening took "less than a minute"); ECF 50-7 (Decl. of Shaquetta

Taylor), at 2 ¶ 5, 7 (stating primary screening took "under a minute total" and secondary screening

took "less than a minute"); Decl. of Andrea Alston, at 2 ¶¶ 5, 6, 7 (stating it took "less than 3

seconds" to walk through the express lane, "ten seconds or less" in the bag lane, and "less than a

minute" to go through secondary screening); ECF 50-9 (Decl. of Angela Olsen), at 2 ¶ 5, 6 (stating

it took five seconds to go through security and secondary screening lasted a few seconds); Decl.

of Brandy Venable, at 2 ¶ 5, 7 (stating security took five seconds in the express lane, ten seconds in the bag lane, and 15 to 20 seconds in secondary screening); ECF 50-11 (Decl. of George Bircher), at 2 ¶ 5, 7 (stating it took "one to two minutes total" to go through security and 15 seconds to go through secondary screening); Decl. of George Bol, at 2 ¶ 4, 6 (stating the express lane took "one second" and secondary screening took "one to two minutes total"); Decl. of Tarrence Fossett, at 2 ¶ 4, 6 (stating it typically takes "less than a second" to walk through express or divestment lanes, but when there is a line the process takes "less than 30 seconds" and secondary screening could take "less than two seconds" or "up to 10 seconds"); Decl. of William Jones Jr., at 2 ¶ 5, 7 (stating security takes "two seconds or less" and secondary screening "depends on how many people are in line," but usually occurs "in less than a minute"); Decl. of Alexander Cunningham, at 2–3 ¶ 7, 8 (stating it took five to ten seconds to pass through security and secondary screening "took no more than one minute, though occasionally during peak season it could take up to three minutes, at most"); Decl. of Kim Goad, at 2–3 ¶¶ 5, 6, 9 (stating it took 30 seconds to a minute to go through security, but took "one minute longer—up to one to two minutes total—[during peak season]" and secondary screening took a minute or less); Decl. of Melissa Renee Whitehead, at 2 ¶ 5, 7 (stating she "did not have to slow down" walking through security and secondary security "never took more than five minutes and took on average two and a half minutes"); Decl. of Sara Sowiak, at 2 ¶ 7, 10 (stating it took less than one minute total to go through security and secondary screening took no longer than two minutes). All of the putative class claims rest on the same basic theory of recovery—that employees should be compensated for mandatory post-shift security screening because they were required to be on the premises—and no group has incentives to undermine the recovery of another group. Accordingly, the requirements of Rule 23(a)(4) are met.

Having found the requirements of Rule 23(a) met, the Court now turns to the requirements for certification of a Rule 23(b)(3) class: predominance and superiority.

### 6.    Predominance

Rule 23's "predominance" requirement is satisfied when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3). Rule 23(b)(3)'s requirement that common questions of law or fact predominate over individual ones is similar to, but "far more demanding" than Rule 23(a)'s commonality requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997); *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 771 (D. Md. 2012). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)). In conducting the predominance analysis, the court "'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods*, 577 U.S. at 453 (quoting 2 Newberg § 4:49, pp. 195–196 (5th ed. 2012)). "This is not simply a matter of counting common versus noncommon questions and checking the final tally." *Soutter*, 307 F.R.D. at 214. The commonality-predominance test is "qualitative rather than quantitative." *Id.* (citations omitted). "If the qualitatively overarching issue in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." *Id.* (citation and quotations omitted). Thus, Rule 23(b)(3) "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof, but it does require that common questions predominate over any questions affecting only individual [class] members." *In re Marriott Int'l,*

21

*Inc.*, 341 F.R.D. 128, 155 (D. Md. 2022) (citations and quotations omitted). The inquiry "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods*, 577 U.S. at 453 (quoting *Amchem Prods. Inc.*, 521 U.S. at 623). The Court finds that Plaintiff has satisfied her burden of demonstrating predominance here.

As discussed in the analysis of commonality, Plaintiff's claims present common legal questions as to the compensability of security screening wait-times. The evidence submitted by both parties in connection with the motion for class certification demonstrates the existence of a common policy that subjected all individuals included in the class definition to mandatory security screenings upon exit from a facility. *See supra* Section 3 (listing uniform security practices across facilities based on employee declarations). In addition, there is no dispute that employees were not compensated for this time. ECF 50, at 9. Thus, the "same evidence will suffice for each member to make a prima facie showing" that they were subject to the security policy and incurred uncompensated time, and the legal questions are capable of classwide resolution, specifically with respect to the primary issue of whether security wait time was time employees were "required" to be on the premises, such that it can constitute "hours worked" under the Maryland Wage Laws. *See Amaya*, 326 F.R.D. at 450 ("The question of whether such a policy was valid would predominate over individual fact issues because its answer would necessarily resolve whether carpenters would be entitled to damages for every hour paid as a laborer.").

The Court agrees with Plaintiff that the factual matter of the literal amount of time spent in security screening implicates a damages inquiry and therefore cannot alone preclude certification. While the application of the *de minimis* defense may be relevant to liability as to each individual plaintiff's claim, the Court does not find that these individualized liability and damages issues

predominate over the threshold liability issues capable of class-wide determination.[7] For instance, as the Court noted in *Alfonso*, the "question of the application of the *de minimis* defense to individual plaintiffs would not need to be reached if the threshold liability determinations of the compensability of security and walking time [] were answered in Defendant's favor." *Alfonso*, 2024 WL 1007220, at *14. Thus, the Court does not find that issues surrounding the *de minimis* defense predominate over the common question of liability. *See Davis*, 2023 WL 8373162, at *5 ("[T]he central question of whether the relevant time is categorically compensable predominates over individual differences in liability or damages."). And in fact, the threshold question of whether the *de minimis* defense can even be applied to Plaintiffs' state law claims is a common question that can be litigated on a class-wide basis. *See Ornelas v. Tapestry, Inc.*, Civ. No. 18-6453, 2021 WL 3471173, at *6 (N.D. Cal. Aug. 6, 2021) (noting that the "question of whether the *de minimis* defense is even applicable [to a state law claim] is a common and predominating one").

To be sure, there are individual questions in this litigation, including how much time an employee actually spent going through security and whether an employee's individual time is *de minimis* (and therefore non-compensable). *See Ornelas*, 2021 WL 3471173, at *6 ("In the event that defendant loses on the merits, it will be necessary to litigate the issue of who actually stood in line and for how long."). There is undoubtedly variation in the available routes taken by employees after going through security but before exiting the building. *See* ECF 50, at 22 (alleging that employees walk through the facility, go to a breakroom, locker room, or restroom, and/or socialize with or wait for co-workers). Plaintiff has provided expert reports, however, which demonstrate

---

[7] Importantly, Defendant cites no binding authority for the proposition that a *de minimis* exception even applies to the time spent in security screening lines as alleged in this case. *See* ECF 59, at 12–13.

how Plaintiff would seek to demonstrate liability and damages through representative proof. *See* ECF 58, at 14–17.

While Defendant argues that the "punch-to-swipe" method proffered by Plaintiff does not provide a common or accurate method for calculating damages, ECF 50, at 22, the Court notes that the absence of records documenting the precise time involved is a result of Defendant failing to track or retain such data. Defendant should not be allowed to "prevent class certification due to a record-keeping problem of its own making." *Ornelas*, 2021 WL 3471173, at \*6; *see also Castillo v. Urquhart*, 855 Fed. App'x 877, 880 (4th Cir. 2021) ("the 'employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [s]he kept records'") (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946)). Additionally, "to the extent Defendant will challenge these reports as 'unrepresentative or inaccurate,' that in itself is a defense 'common to the claims made by all class members.'" *Alfonso*, 2024 WL 1007220, at \*14 (citing *Tyson Foods*, 577 U.S. at 457).

Other individualized questions that Defendant points out "do not overcome the predominance of the common questions, as these variations again go to damages and do not impact the common liability questions." *Alfonso*, 2024 WL 1007220, at \*15. Defendant contends that: 1) what an employee brings onto the secured floor may impact time in security, ECF 50, at 16; 2) employees varied in whether they took time to pursue other activities between going through security and exiting the facility, which renders the "punch-to-swipe" data unreliable, *id.* at 22–23; and 3) even if the time spent in security counts as "work" under *Amaya*, "each putative class member still must prove that they were owed unpaid overtime wages for a particular pay period," *id.* at 18. While these questions could impact damages and the applicability of the *de minimis* defense, they are ultimately insufficient to outweigh the common questions, *see supra*

Section 3, and in any event, their relevance may be obviated by the answers to the common liability questions. *See Headly v. Liberty Homecare Options, LLC*, No. 20-cv-00579, 2022 WL 2181410, at *16 (D. Conn. June 16, 2022) (finding predominance met because the "predominant questions are questions of law common to all the claims"). Whether time undergoing post-shift security screenings is compensable "hours of work" under Maryland Wage Laws, whether a *de minimis* exception applies to Maryland state law wage claims, and whether the Maryland Wage Laws provide for the recovery of unpaid "straight time" hours under 40 in a week at the Maryland minimum wage or the worker's regular hourly rate of pay, are questions of law common to all class members' claims and predominate over any individual questions. ECF 58, at 9–11. Therefore, this Court finds that predominance is satisfied.

### 7.    Superiority

A class action is the superior mechanism for deciding Plaintiffs' claims. Under Federal Rule 23(b)(3), the Court must find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The court must compare possible alternatives to the class action to determine "whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010). Courts consider the following four factors when assessing the superiority of the class action: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). In addition, the Supreme Court has recognized that, when creating the 23(b)(3) class action mechanism, the

Advisory Committee "had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all," due to the potential for only a small recovery. *See Amchem Prods., Inc.*, 521 U.S. at 617 (citation and quotations omitted).

The Court finds that the "superiority" requirement is met here. The interest in personal control of the litigation is minimal, and to the extent any individual does wish to retain control of their own case, the opt-out mechanism will be available. Moreover, the individual recoveries here may be quite small, a fact that both Defendant and Plaintiff both appear to acknowledge. *See* ECF 50, at 17 (implicit in *de minimis* argument); ECF 44-1, at 31. This weighs in favor of superiority, as it regularly does in wage-and-hour claims. *See, e.g., Lassen*, 2014 WL 4638860, at *12 (finding superiority where "the relatively modest damages that might be recovered by any single [class member] would likely make the cost of individual litigation prohibitive"); *see also Davis*, 2023 WL 8373162, at *6 (finding that "large class size, the modest individual claims, and the largely unifying legal issues" were sufficient for superiority); *Ornelas*, 2021 WL 3471173, at *7 ("[T]he fact of the relatively small recoveries for each class member weighs in favor of aggregating the claims."). Contrary to Defendant's contention, trying the class members' claims for unpaid wages due to Defendant's security policy on a class basis, as opposed to employee-by-employee, would advance efficiency and economy.

Second, the Court is not aware of any related litigation regarding the Maryland fulfillment centers. ECF 44-1, at 31. Further, concentrating the class action in the District of Maryland is desirable because the fulfillment centers are all located within this district. *Id.*

Defendant's primary contention is that the "putative class is unmanageable and will require unwieldy mini-trials." ECF 50, at 30. Defendant further argues the benefits of class certification

are diminished "where the remaining individualized issues will also require significant resources."
ECF 50, at 32 (citing *In re Marriott Int'l*, 78 F.4th 677, 689 (4th Cir. 2023)). Plaintiff argues that
the expert analysis prepared by Dr. Fox "can be conducted for the remainder of the class[,]
demonstrating that trial of this case can proceed without 'mini-trials for all of the nearly 24,000
class members' as Amazon suggests." ECF 58, at 15 (quoting ECF 50, at 28). Given that
Defendant is unable to produce timekeeping data of its own, the Court agrees that the lack of
precise records to calculate damages is an insufficient reason to deny certification. As discussed
*supra*, at Section 6, Defendant should not be allowed to prevent class certification due to a record-
keeping problem of its own making. *Ornelas*, 2021 WL 3471173, at *6. Additionally, as the
Court explained in *Davis v. Target Corp*, "[c]ommon proof will be at the center of both the liability
and damages determinations, with individualized issues appearing to take a secondary—and
calculations-only—role.[8] 2023 WL 8373162, at *6. And finally, Defendant's manageability
concerns "can be ameliorated by the district court's authority to manage the litigation effectively."
*Alfonso*, 2024 WL 1007220, at *15. Accordingly, the Court is satisfied that a class action is a
superior mechanism for litigating common questions of liability.

### 8.   Appointment of Class Counsel

Having certified a class as defined above, the Court appoints as class counsel the law firms
of Joseph, Greenwald, & Laake, P.A., and Winebrake & Santillo, LLC. Federal Rule of Civil
Procedure 23(g) requires the court to consider "the work counsel has done in identifying or
investigating potential claims in the action;" counsel's "experience in handling class actions," and
the "types of claims asserted in the action," counsel's "knowledge of the applicable law," and the

---

[8] Moreover, the "issue of how much recovery is warranted, including how many employees
worked allegedly compensable overtime, is entirely live and [Amazon] is free to dispute it." *Davis*,
2023 WL 8373162, at *6.

"resources that counsel will commit to representing the class." In addition, class counsel must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4).

Attorney Santillo and Attorney Markovitz have submitted declarations which satisfy the Court that they meet the requirements for class counsel under Rule 23(g). *See* ECF 44-1, at 33; ECF 44-3 (Decl. of Andrew Santillo), at 2–12; ECF 44-4 (Decl. of Brian Markovitz), at 2–4. Both attorneys have significant experience with wage payment and collections cases, knowledge of wage-and-hour law, and have clearly done significant work already in this case throughout discovery and the preparation of the motions and opposition papers now before the Court. Their qualifications have not been challenged, and no other applicant seeks the appointment of class counsel. Accordingly, the law firms of Joseph, Greenwald, & Laake, P.A., and Winebrake & Santillo, LLC are appointed as class counsel.

### 9.    Proposed Form of Notice

Federal Rule of Civil Procedure 23(c)(2)(B) requires that class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. *Id.* The notice also must clearly and concisely state: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3). *Id.*

Plaintiff proposes that Settlement Services, Inc ("SSI") issue notice to class members and that class counsel pay all fees and expenses associated with notice. ECF 44-1, at 33. Plaintiff also sets forth a proposed deadline schedule for obtaining class members names and last known

addresses and mailing the requisite notice forms. *Id.* at 33–34. Plaintiff also includes a table indicating which section of the form satisfies each Rule 23(c)(2)(B) requirement. *Id.* at 34–35. Defendant asserts that the notice form is improper because it "mischaracterizes the claim at issue" by "indicat[ing] that Plaintiff is pursuing a claim for all time spent on the premises after clocking out [] and not just for the amount of time spent in the security screening process." ECF 50, at 32.

Under the requirements set forth in Rule 23(c)(2)(B), the Court finds that the notice form clearly and concisely states: the nature of the action in Section 1, definition of the class certified in Section 2, class claims, issues, or defenses in Section 1, that a class member may enter an appearance through an attorney if a class members so elects in Section 5, that the Court will exclude any member who requests exclusion in Section 4, the time and manner for requesting exclusion in Section 4, and the binding effect of a class judgment in Section 3. However, the Court agrees with Defendant that the language about the nature of the action should be amended to more accurately reflect Plaintiff's claim. ECF 50, at 32. The Court directs Plaintiff to amend the notice language in Section 1 as follows: "In the lawsuit, Plaintiff alleges that Amazon violated two statutes called the Maryland Wage Payment and Collections Law and the Maryland Wage and Hour Law, and the common law of unjust enrichment by failing to pay hourly employees wages for time completing mandatory post-shift security screenings. According to Plaintiff, such time must be counted as compensable time and paid accordingly."

### B.    Certifying Question of State Law to Supreme Court of Maryland

The State of Maryland has authorized federal courts to certify unsettled questions of state law to its Supreme Court. *See* Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 12-603; Md. Rule 8-305. Under the Maryland Uniform Certification of Questions of Law Act, CJP § 12-601 et seq. (the "Act"), the Supreme Court of Maryland may "answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation

in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJP § 12-603. The purpose of the Act is "to promote the widest possible use of the certification process in order to promote judicial economy and the proper application of [Maryland]'s law." *Proctor v. Wash. Metro. Area Transit Auth.*, 990 A.2d 1048, 1056 (2010) (quoting Uniform Certification of Questions of Law Act § 3 cmt. (1995)) (alterations in original). The decision of whether to grant a motion to certify "rests in the sound discretion of the federal court." *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).

Defendants have advanced an alternative argument that the security screening time at issue is not compensable under "the doctrine *de minimis non curat lex* (the law does not take account of trifles)." ECF 50, at 17–18; *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 233 (2014). The Supreme Court "declared that because '[s]plit-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act,' such 'trifles' as 'a few seconds or minutes of work beyond the scheduled working hours' may be 'disregarded.'" *Id.* at 233–34 (quoting *Mt. Clemens Pottery Co.*, 328 U.S. at 692). Plaintiff maintains that "there is no *de minimis* doctrine under Maryland Wage Law and [] it is not applicable to the claims here." ECF 58, at 10.

Defendant admits that the *de minimis* doctrine has not been *expressly* endorsed by Maryland's state courts in the state wage and labor context. *See* ECF 43-1, at 18 ("Maryland courts, too, have long recognized the *de minimis* doctrine as a background legal principle in a variety of contexts. There is no reason why Maryland would not also recognize the doctrine in the wage-and-hour law context."). Maryland precedent addressing the *de minimis* doctrine in this context is sparse. Plaintiff cites Justice Biran's question at oral argument in *Rojas v. F.R. General Contractors, Inc., et al.*, the companion case to *Amaya,* asking counsel whether the court "should

be thinking about some kind of *de minimis* exception," ECF 51, at 29, as evidence that the state court "considered whether to create a *de minimis* rule," but ultimately decided not to do so. *Id.* Defendant, on the other hand, argues that Justice Biran's question "shows openness to a *de minimis* rule," but asserts that the Court did not have an occasion to reach the issue on the facts presented in *Amaya/Rojas*. ECF 59, at 13.

The Court is satisfied that "there is no controlling appellate decision, Constitutional provision or statute" of the State of Maryland that resolves the question of whether there is a *de minimis* exception available to Maryland Wage Law claims—nor is there sufficient authority that would permit this Court to reasonably guess how the Supreme Court of Maryland might resolve that question. Federal courts in this district have routinely analyzed the application of the *de minimis* exception to FLSA claims. *See, e.g., Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 811 (D. Md. 2014) (analyzing whether Plaintiff's work was *de minimis* and therefore not compensable under the FLSA); *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350, 363 (4th Cir. 2011) (holding that, under the FLSA, employers must pay employees a minimum hourly wage for all "hours worked" unless the time at issue is *de minimis*). However, it appears that the question has not yet been answered as to whether wage claims under Maryland *state* law also include a *de minimis* exception.

Like the Portal-to-Portal Act (PPA) question in *Amaya*[9], the *de minimis* rule concerns the construction and application of the Maryland Wage Laws, and its resolution is likely to affect numerous workers and employers in Maryland. Additionally, "when a question of state law

---

[9] *Amaya* made clear that COMAR 09.12.41.10 does not adopt the federal restrictions in the PPA limiting compensable work or hours of work to the performance of principal activities during employment and does not broadly exclude activities such as traveling. *Amaya*, 278 A.3d at 1246. Given this more expansive interpretation of Maryland Wage Laws, the Court is particularly wary of deciding whether a *de minimis* rule applies to state law claims.

presents an issue of first impression, or if a possible interpretation might have the result of creating new law, a federal court must err on the side of restraint." *Enomoto v. Space Adventures, Ltd.,* 624 F. Supp. 2d 443, 457 (E.D. Va. 2009) (citation omitted). The state court is best equipped to decide this question of law, especially given that state courts, rather than federal courts, have handled this question as a matter of first impression in other jurisdictions. *See In re Amazon, Inc.*, 942 F.3d 297, 304 (6th Cir. 2019) (certifying question to Pennsylvania Supreme Court regarding whether the doctrine of *de minimis non curat lex* applies to bar claims brought under the Pennsylvania Minimum Wage Act); *Troester v. Starbucks Corp.*, 5 Cal. 5th 829, 848 (Cal. 2018) (holding that the federal *de minimis* rule does not apply to certain claims for unpaid wages under California labor laws). The Court is mindful that the parties have not requested that any questions be certified to the Supreme Court of Maryland. Nevertheless, a decision to certify an issue to a state high court "rests in the sound discretion of the federal court," *see Lehman Bros.*, 416 U.S. at 390–91, and the Court is entitled to *sua sponte* certify a state law question. *See Elkins v. Moreno*, 435 U.S. 647, 662 (1978); *see also Mitchell Tracey v. First Am. Title Ins. Co.*, 950 F. Supp. 2d 807, 809 (D. Md. 2013) (adding a fourth certified question *sua sponte*).

Considering the lack of governing state law and the Maryland Supreme Court's recent decision in *Amaya* holding the Maryland Wage Laws provide broader protection than the protections under the FLSA, the Court hereby certifies to the Supreme Court of Maryland the issue of whether the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law allow for a *de minimis* exception. The court's answer—if it elects to furnish one—will be "determinative of an issue in pending litigation." *See* CJP § 12-603. Once the certified question is resolved, existing authority will provide the Court with adequate guidance to resolve Defendant's pending motion for summary judgment.

## IV. CONCLUSION

For the reasons described herein, Plaintiff's motion to certify the class is **GRANTED**.

Accordingly, notice will be provided to putative class members, who will have the opportunity to opt out of the lawsuit if they choose to do so. The Court finds that the notice form contains all of the information required by Rule 23(c)(2)(B). Plaintiff shall modify the description of the lawsuit in Section 1 as indicated above.

To facilitate notice to the class, Defendant is ordered to produce a list of class members including their names and last known addresses to Plaintiffs' counsel within 15 business days of the date of this Order. Plaintiffs' counsel is authorized to mail the approved notice to the class members within 25 business days of the date of this Order.[10] The notice should include a date 65 business days after the date of this Order to allow putative class members to opt out of the class.

Additionally, the Court **CERTIFIES** the following question to the Supreme Court of Maryland:

- Does the doctrine of *de minimis non curat lex*, as described in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) and *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), apply to claims brought under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law?

The phrasing of the question is not intended to restrict the Maryland Supreme Court's consideration of the issues involved. A separate implementing Order will issue.

Dated: November 18, 2024

/s/
Brendan A. Hurson
United States District Judge

---

[10] Certifying a question to the Supreme Court of Maryland and receiving an answer—if the court elects to furnish one—unquestionably takes time. Accordingly, the Court is open to considering a delay in mailing the notice to class members at the request of the parties.