**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

ESTEFANY MARTINEZ, *

Plaintiff, *

v. * Civil No. 22-502-BAH

AMAZON.COM SERVICES LLC, *

Defendant. *

* * * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Estefany Martinez ("Plaintiff" or "Martinez") brings this action against Defendant Amazon.com Services, LLC ("Defendant" or "Amazon"), alleging on a class-wide basis that she and putative class members have worked compensable time under Maryland law for which they have not been paid. ECF 4 (joint stipulation) ¶ 1; *see* ECF 5, at 1–2 ¶¶ 1–3 (complaint). The Court previously granted Martinez's motion for class certification and certified to the Supreme Court of Maryland the question of whether the doctrine of *de minimis non curat lex* applies to claims brought under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law. ECF 75 (order); *see also* ECF 74 (memorandum opinion). The case was stayed pending the Supreme Court of Maryland's resolution of the certified question. *See* ECF 85. The Supreme Court of Maryland then answered the question in the affirmative, holding that "the *de minimis* doctrine applies to claims brought under the Maryland Wage and Hour Law and the Maryland Wage Payment and Collection Law." *Martinez v. Amazon.com Servs. LLC*, 338 A.3d 636, 655 (Md. 2025) (emphasis added).

With that answer in hand, the Court turns to Amazon's two pending motions. The first is Amazon's motion for summary judgment. ECF 43. Martinez filed an opposition, ECF 51, and Amazon filed a reply, ECF 59. Following the resolution of the certified question, the parties submitted a joint request to file supplemental briefing, ECF 95, which the Court granted, ECF 97. Both parties then filed supplemental briefing. ECF 98 (Amazon); ECF 100 (Martinez). The second pending motion is Amazon's motion for reconsideration of class certification. ECF 81. Martinez filed an opposition, ECF 86, and Amazon filed a reply, ECF 89. Martinez also filed a motion to file a surreply, ECF 90,[1] which the Court will **GRANT**. All filings include memoranda of law and several filings include exhibits.[2] The Court has reviewed all relevant filings and finds that no hearing is necessary.[3] *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Amazon's motion to reconsider class certification is **GRANTED**, Martinez's motion for class certification is **DENIED**, and Amazon's motion for summary judgment is **DENIED.**

## I. BACKGROUND

Martinez challenges the legality of standardized pay policies[4] that Amazon has imposed on all putative class members under the Maryland Wage Payment and Collections Law ("MWPCL"), the Maryland Wage and Hour Law ("MWHL") (collectively "Maryland Wage Laws"), and under

---

[1] Plaintiff attached her proposed surreply to the motion. ECF 90-1.

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] Accordingly, Amazon's request for a hearing on the motions, ECF 99, is **DENIED.**

[4] Specifically, Plaintiff challenges Amazon's policies of "(i) requiring all class members to undergo post-shift security screenings within the facilities; (ii) requiring all class members to clock-out for pay purposes prior to the post-shift security screening process; and (iii) rounding class members' pay to the end of their scheduled shift if they clock-out within five minutes of the end of their scheduled shift." ECF 51, at 6.

the common law doctrine of unjust enrichment. ECF 5, at 7–9. Specifically, Martinez challenges Amazon's practice of requiring a mandatory screening for stolen items at the end of each workday while failing to compensate employees for the time associated with that screening, such as "time spent waiting in security lines and going through the security screening process." *Id.* at 3–4 ¶¶ 15–16. It is undisputed that Amazon did not compensate workers for this time. *See* ECF 21 (answer) at 1–2 ¶ 3, at 4 ¶ 16, at 5 ¶¶ 27–28, at 6 ¶ 38. Rather, Amazon asserts that this time is not compensable under Maryland Wage Laws. *Id.*

### A. Factual Background

The Court reviewed the facts in its prior memorandum opinion and reproduces those facts here. *See Martinez v. Amazon.com Servs. LLC*, Civ. No. BAH-22-00502, 2024 WL 4817214, at *2–4 (D. Md. Nov. 18, 2024). Martinez is a former Amazon employee who worked as a Fulfillment Associate between June 20, 2017, and November 12, 2021, at the Baltimore Fulfillment Center ("BWI2").[5] ECF 21, at 3 ¶ 13. Specifically, Martinez worked as "packer" on the facility floor, where she sealed boxes and put them on a conveyor belt. ECF 43-3, at 4–5, 15:12–16:15. From the time Martinez first began working for Amazon on November 18, 2018, through March 2020, she, like most other hourly Maryland fulfillment center employees, was required to clock out at the end of the day before beginning the required post-shift security screening process. ECF 51, at 8; ECF 51-1 ("Gilbert-Differ Dep."), at 5, 81:3–18 (indicating security screening stopped during April 2020), at 15, 121:1–6 ("Certain associates would be

[5] The parties stipulated that the relevant time period for the claims in this action is from the beginning of the limitations period "through and until when security screening was turned off at Amazon's Maryland fulfillment centers because of the COVID pandemic," in April of 2020. ECF 43-1, at 4 n.1 (quoting ECF 43-3, at 15–16, 74:17–75:3.); *see also* ECF 51, at 6 n.3 (noting minor discrepancy in transcript). As the Court has previously held, the applicable statute of limitation is three years and two weeks for Plaintiff's MWPCL claim, and three years for Plaintiff's other claims. *Martinez v. Amazon.com Servs. LLC*, Civ. No. BAH-22-00502, 2024 WL 4817214, at *2 n.2 (D. Md. Nov. 18, 2024).

granted an exemption from screening. These were case by case, but most commonly associated with medical conditions.").

1. Employees Could Use Lockers or Carry Items into the Secured Area

Employees arriving to begin their shift would have the option to store their personal belongings in lockers before entering the secured area of the fulfillment floor. *See* ECF 43-4, at 6–9, 15:6–18:18 (describing the location of the lockers relative to the turnstiles at the exit). Martinez did not use the locker because she did not "know how to use it." *See* ECF 51-3, at 5, 46:12–20 ("I had a locker, like I said. I didn't know how to use it because it had like a padlock on it, and it had a combination like they gave me on a piece of paper in order to open it, but I didn't know how to open it.").

Employees were permitted not to use the lockers, and instead to carry their personal items onto the warehouse floor. *See* ECF 43-3, at 19, 83:16–20. Martinez chose to bring a backpack into the work area. *Id.* Amazon did not require any personal items for work in the secured area, and no personal items were necessary for work functions. *Id.* at 4–5, 15:12–16:15 (describing scope of job duties); *id.* at 19–20, 83:22–84:10 (Martinez responding "it wasn't necessary but I did," when asked if bringing a bag was needed to perform the work and affirming that Martinez chose to bring a backpack into the work area).

2. The Security Screening Process

From November 2018 through March 2020, employees who exited fulfillment centers with security screening passed through a security area on their way out of the building. ECF 44-5, at 10 (confirming in response to interrogatory that associates at the relevant facilities would clock out before passing through exit security screening to leave the facilities); ECF 43-4, at 12, 81:13–18 (noting the cessation of security screenings in April 2020 during COVID-19). Martinez's work location, BWI2, had two exits, an east and west exit. ECF 43-3, at 7–8, 30:7–31:21. Martinez

usually used the east exit. *Id.* Security screening at each of BWI2's exits consisted of metal detectors arranged in a row. ECF 43-3, at 34–38 (photographs of metal detectors), at 17, 77:3–78:12. Employees clocked out before passing through the security screening areas at BWI2.[6] ECF 51-4, at 9.

Employees had three options for passing through the metal detectors, depending upon the items on their person. They could travel through: (1) an "express lane," where employees would walk through a metal detector if they chose not to bring any items to the floor that would trigger the metal detector, ECF 43-4, at 15, 120:6–10; (2) a "divestment lane," where employees could slide items that would trigger the metal detector down a sloped table for visual inspection and then pass through the metal detector, ECF 43-3, at 24, 91:3–7; and (3) a bag scan lane, where employees could place a bag on a conveyor belt and have it scanned while the employee walked through the metal detector, ECF 43-4, at 13, 97:12–19.

The undisputed testimony is that a line would form in the bag-check lane. ECF 51-1, at 7–8, 94:21–95:21 ("The area where a line would likely form is actually at the x-ray device."), at 9, 96:11–16 ("The reason that you would have a line at the x-ray device is because it has the capacity to process one bin, one bag at a time, and therefore, a line would form as individuals placed their bags usually into a bin ready to push through the x-ray device."). Martinez testified that there would at times be approximately 20 people in line ahead of her in the bag-check lane. ECF 43-3, at 21, 88:2–3.

Whether and to what extent a line would form in the divestment lane or the express lane is unclear. Martinez testified that "even in the express lane, there would be several people lined up."

---

[6] Members of the putative class come from three fulfillment centers: BWI2, the Sparrows Point fulfillment center ("DCA1"), and the North East fulfillment center ("MDT2"). ECF 51, at 6.

ECF 43-3, at 21, 88:8–11. Geoffrey Gilbert-Differ, Amazon's Senior Regional Loss Prevention Manager, ECF 51-4, at 5, testified that he only ever observed lines accrue in the bag-check lanes with the x-ray devices, ECF 51-1, at 7–8, 94:21–95:21 ("The area where a line would likely form is actually at the x-ray device."), at 22, 143:11–14 ("An express lane is really intended to be purely something someone could walk through. Virtually you are making no stops or taking no actions.").

Martinez never used the express lane. ECF 43-3, at 22, 89:18–21. Martinez occasionally used the divestment lane when she did not bring her bag to work. *Id.* at 24, 91:8–15. The undisputed testimony is that if someone did set off the metal detector, they would be subject to secondary screening in form of a magnetic wand being waved around them. *See* ECF 43-3, at 25–26, 92:22–93:3 (indicating Martinez triggered the metal detector "about twice"), at 26, 93:20–22 (testifying that someone from security waved a metal detector wand in front of Martinez and behind her for "maybe three" seconds as part of the secondary screening). Additionally, to cut down on the need for secondary screenings, all employees were instructed not to bring metal into the secured area to the extent possible. *See* ECF 43-3, at 27, 96:4–20.

3. <u>Time Punch Data Comparisons to Exit Swipe Data</u>

There is no way to definitively know how long employees waited in line, but Amazon did collect two forms of time-related data—time punch data and exit swipe data—which may permit some inferences. *See* ECF 43-5, at 2 ¶¶ 4–5. "Time Punch Data" indicates the time at which the employee finished their shift and clocked out at a time clock within the secured area. *Id.* ¶ 4. "Exit Swipe Data" refers to the time at which the employee swiped their badge at a turnstile at the facility exit after they passed through security and were leaving the facility. *Id.* ¶ 5.

The difference between the punch time and exit swipe time does not necessarily capture the time an employee spent waiting in a security line, because if "on any given day an employee conducted any other activities after punching out at a time clock—such as using the restroom,

going to the employee's locker, visiting a break room, or chatting with another employee, etc.[,]" then the difference between the employee's clock out time and exit swipe time would not provide an accurate measurement of the time the employee spent waiting in a security line. *Id.* ¶ 6. Additionally, "[e]ven if the employee went straight from security to the exit turnstile, the difference between clock out and exit swipe time would still exceed the time spent passing through security because that difference would also include the employee's time spent walking to an exit turnstile and waiting behind others to swipe out at the turnstile." *Id.*

Amazon provided this time clock and exit swipe data to Peter Nickerson, an economist at Nickerson & Associates, LLC, a consulting firm specializing in economic and statistical analysis. *Id.* at 1 ¶¶ 2–3 (indicating Amazon provided 947,800 rows of time clock punch data and 1,235,356 rows of exit swipe data for the period of December 1, 2018, through May 21, 2019). Mr. Nickerson determined that Martinez worked a total of 68 shifts during the relevant period, and for 20 of those shifts (29.4% of shifts), it took three minutes or less after clocking out for Martinez to exit the facility through the exit turnstile. *Id.* at 2 ¶ 7. For 28 of the remaining 48 shifts (41.2% of shifts), she took between three to five minutes from clocking out to reach the exit turnstile. *Id.* For 11 of the remaining 20 shifts (16.2% of shifts), Plaintiff took between five and eight minutes to exit after clocking out. *Id.* For 6 shifts (8.8% of shifts), Plaintiff took 15 minutes or more to exit after clocking out.[7] *Id.*

In total, it took Martinez more than 5 minutes to exit after clocking out on 20 occasions. ECF 43-5 at 3 ¶ 8. During these 20 shifts, on at least 214 occasions a different employee punching

[7] The Court notes that Mr. Nickerson indicated that Plaintiff worked a total of 68 shifts, but only 65 shifts are analyzed. *See* ECF 43-5, at 2 ¶ 7. Three shifts are unaccounted for in Nickerson's analysis.

out within one minute of the same time as Martinez made it to the exit turnstiles in 3 minutes or less. *Id.* ¶ 9.

Counsel for Martinez and the proposed class retained Liesl Fox, a Senior Consultant and Partner at Quantitative Research Associates, to create "a damages model and report for Plaintiff that calculates the value of the wages associated with the time between when she stopped getting paid each day and when she swiped out to exit the facility after completing the post-shift security screening process." ECF 44-1, at 16; ECF 44-9, at 2. Based on the data provided, Ms. Fox concluded that Plaintiff "experienced a total 9.61 Paid-to-Exit Time Lag hours during the period from November 18, 2018[,] through May 20, 2019, of which 1.95 exceeded the 40-hour per week overtime threshold" and thus Plaintiff "would be owed a total of $161.65." *Id.* at 3. Ms. Fox indicated that "if similar data files were produced for additional employees who worked at Amazon fulfillment centers in Maryland, the same analysis used to prepare this report could be applied to the new data files on a class-wide basis." *Id.*

### B. Procedural Background

Martinez filed this case on December 2, 2021, on behalf of herself and the putative class in the Circuit Court for Baltimore City. ECF 1, at 1 ¶ 1. Amazon filed a Notice of Removal pursuant to 42 U.S.C. § 1441(a). *Id.* at 3 ¶ 11. Though Martinez has alleged only state law causes of action, this Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), as codified in relevant part in 28 U.S.C. § 1332(d)(2). CAFA allows for federal subject matter jurisdiction over any civil class actions in which: (a) any member of a class of plaintiffs is a citizen of a State different from any defendant; (b) the aggregate number of putative class members in all proposed plaintiff classes is at least 100; and (c) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §§ 1332(d)(2)(A), 1332(d)(5); *see also* ECF 1, at 4–12 (outlining basis for jurisdiction).

The case was originally stayed pending the outcome of two cases at the Supreme Court of Maryland: *Amaya v. DGS Constr., LLC, et al.*, No. 14 (Md. Sept. 2021 Term), and *Juan Carlos Terrones Rojas, et al. v. F.R. Gen. Contractors, Inc., et al.*, No. 17 (Md. Sept. 2021 Term).[8] *See* ECF 4, at 1–2 ¶¶ 2–3 (consent motion to stay proceedings); ECF 8 (granting parties' motion to stay). On October 4, 2022, Judge Griggsby lifted the stay.[9] ECF 11; *see also* ECF 10 (requesting the Court lift the stay). Thereafter, on November 4, 2022, Amazon filed its answer, ECF 21, and the parties engaged in discovery that included depositions and the exchange of written discovery, *see* ECF 56 (indicating completed portions of the Court's scheduling order). Amazon filed its motion for summary judgment on November 21, 2023. ECF 43. On the same date, Martinez filed her motion for class certification. ECF 44.

On November 18, 2024, the Court issued a memorandum opinion and order granting Plaintiff's motion for class certification and certifying the following question to the Supreme Court of Maryland in order to resolve Amazon's pending motion for summary judgment: "Does the doctrine of *de minimis non curat lex*, as described in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) and *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014), apply to claims brought under the Maryland Wage Payment and Collection Law and the Maryland Wage and Hour Law?" ECF 75; ECF 74; *Martinez*, 2024 WL 4817214, at *16–17. On November 25, 2024, Amazon moved to stay class notice and class discovery pending the Supreme Court of Maryland's resolution of the certified question, ECF 79, which the Court granted, ECF 85. On December 2, 2024, Amazon additionally moved for reconsideration of class certification. *See* ECF 81. On July

[8] The resolution of those cases was consolidated into one opinion. *See Amaya v. DGS Constr., LLC*, 278 A.3d 1216 (Md. 2022).

[9] On October 23, 2023, the case was reassigned from Judge Griggsby to the undersigned.

2, 2025, the Supreme Court of Maryland answered the certified question in the affirmative. *See Martinez v. Amazon.com Servs. LLC*, 338 A.3d 636, 655 (Md. 2025). Both of Amazon's pending motions are now ripe for decision.

## II. LEGAL STANDARD

### A. Rule 54(b) Motion for Reconsideration

Under Federal Rule of Civil Procedure Rule 54(b), "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment," because "a district court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments, at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003). However, a district court's discretion in reconsidering a prior judgment is generally guided by whether "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice." *See id.* at 515 (quoting *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988)); *see also Lewis v. EquityExperts.org, LLC*, No. 5:22-CV-302-FL, 2025 WL 1287983, at *6 (E.D.N.C. May 2, 2025).

### B. Rule 56(a) Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether

the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). However, the Court "may not make credibility determinations or weigh the evidence." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

## III. ANALYSIS

### A. Reconsideration of Class Certification

Amazon asks this Court to reconsider its grant of Martinez's motion for class certification pursuant to Federal Rule of Civil Procedure 54(b). ECF 81-1; *see also* ECF 74 (memorandum opinion); ECF 75 (order). Amazon primarily takes issue with the Court's conclusions regarding "predominance." *See generally* ECF 81-1.

#### 1. Reconsideration Standard in Class Certification Context

A district court abuses its discretion in the class certification context when it "materially misapplies the requirements of Rule 23." *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 678 (4th Cir. 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014)). "Rule 23(b)(3)'s predominance requirement is necessarily intertwined with Rule 23(a)'s commonality requirement." *Bojangles' Rests.*, 123 F.4th at 679. "Predominance presupposes that a common question exists and measures the question's significance to the pending litigation." *Id.* "While commonality serves to ask whether class-wide proceedings are even possible, predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). "In other words, commonality is a subfactor of predominance," and predominance is "far more demanding."

*Overby v. Anheuser-Busch, LLC*, 178 F.4th 175, 181 (4th Cir. 2026) (quoting *Amchem Prods., Inc.*, 521 U.S. at 624).

The "commonality" requirement of Rule 23(a) asks whether "questions of law or fact [are] common to the class." Fed R. Civ. P. 23(a)(2). The common question of law or fact must "be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law," *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997), so long as the "common question is one that can be resolved for each class member in a single hearing," *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 319 (4th Cir. 2006).

Rule 23(b)'s "predominance" requirement is satisfied when "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3). That requirement "is similar to, but 'far more demanding' than Rule 23(a)'s commonality requirement." *Martinez*, 2024 WL 4817214, at *11 (quoting *Amchem Prods., Inc.*, 521 U.S. at 623–24). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)).

"In conducting the predominance analysis, the court 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common,

aggregation-defeating, individual issues.'" *Martinez*, 2024 WL 4817214, at *11 (internal quotation marks omitted) (quoting *Tyson Foods*, 577 U.S. at 453). "This is not simply a matter of counting common versus noncommon questions and checking the final tally." *Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 214 (E.D. Va. 2015). Rather, "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." *Id.* (quoting *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 272 (4th Cir. 2010)). "If the qualitatively overarching issue in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues." *Id.* (internal quotation marks and citation omitted). "Thus, Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof, but it does require that common questions predominate over any questions affecting only individual [class] members.'" *Martinez*, 2024 WL 4817214, at *11 (quoting *In re Marriott Int'l, Inc.*, 341 F.R.D. 128, 155 (D. Md. 2022)).

2. <u>The Parties' Arguments</u>

Amazon argues that the Court failed to rigorously review whether "the essential elements of the cause of action requires individual treatment" in "at least two respects." ECF 81-1, at 10–11 (first quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)). First, Amazon observes that "the Court expressly declined to resolve whether *de minimis* time spent in security screenings is compensable" and "certified that issue to the Maryland Supreme Court." *Id.* at 11. In doing so, Amazon notes, the Court "raised the potential of delaying distribution of notice to the putative class members," which it contends "inherently recogniz[ed] the significance of the certified question and its potential impact on liability and the class." *Id.* at 11 n.1 (citing ECF 74, at 33 n.10). Amazon argues that this question is relevant to consider prior to class certification

because "if Maryland law does not require compensation for *de minimis* time, then individualized inquiries are indisputably needed to determine liability for anyone." *Id.* at 14.

Second, Amazon argues that "the Court did not resolve Amazon's 'straight time' argument, which would require each putative class member to show that their uncompensated security screening time brought their overall pay below the minimum wage to establish any liability." ECF 81-1, at 11. On this point, Amazon contends that if it is "correct that an employee is not owed any additional pay for screening time when the added time does not take the employee's actual rate of pay below minimum wage . . . then liability would depend on individualized inquiries." *Id.* at 20.

"In addition to reconsidering [the Court's] decision not to resolve" those two legal issues, Amazon "also requests that the Court reconsider its decision to certify a class action without addressing two other" arguments—first, that "individualized inquiries are needed to sort out each putative class member's individual choices" made with respect to the security lanes, and second, that "individualized inquiries are needed to determine whether any class member worked more than 40 hours in a given workweek, even after adding their security screening time to their recorded time." ECF 81-1, at 21. On the first point, Amazon argues that "[t]he punch-to-swipe data is not common proof the factfinder could rely on to answer" that question, because "it does not reflect only time spent in screening lanes" and thus will vary with respect to each individual. ECF 98, at 15. According to Amazon, "[t]he Court needed to resolve these threshold legal issues to analyze whether individualized inquiries needed to prove both essential elements of Plaintiff's claims . . . would predominate." ECF 81-1, at 11.

Martinez defends the Court's analysis in certifying the class as sufficiently rigorous, ECF 86, at 8–9, and suggests that such certification is analogous to the United States Supreme Court's decision in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), in which the Court affirmed

the district court's class certification, ECF 86, at 5–6.[10] Additionally, Martinez attempts to distinguish Fourth Circuit precedent that Amazon invokes related to class certification and predominance, including the Fourth Circuit's recent decision in *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671 (4th Cir. 2024). *See generally* ECF 86; ECF 90-1.[11]

3. Threshold Questions

The Court begins by considering Amazon's contention that it was improper to delay answering "threshold" legal questions that bear on commonality and predominance before certifying the class. "The Supreme Court has emphasized the 'rigorous analysis' that must be performed before a class is certified under Rule 23 – even where that analysis will 'entail some overlap with the merits.'" *In re Marriott Int'l, Inc.*, 78 F.4th 677, 687 (4th Cir. 2023) (quoting *Wal-Mart Stores*, 564 U.S. at 351). So while "Rule 23 does not give district courts a 'license to engage in free-ranging merits inquiries at the certification stage,' a court should consider merits

[10] Martinez invokes the Rule 59(e) standard for reconsideration, ECF 86, at 3–5, which is applicable to motions for reconsideration of a final judgment. *See* Fed. R. Civ. P. 59(e); *Am. Canoe Ass'n*, 326 F.3d at 514 ("True declaratory judgments, like other final orders, trigger heightened standards for reconsideration. *See* Fed. R. Civ. P. 59(e); *id.* 60(b). . . . Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment."). The Court agrees with Amazon that the less strict standards applicable to motions for reconsideration under Rule 54(b) are applicable here. *See, e.g.*, *Robinson v. Fountainhead Title Grp. Corp.*, 252 F.R.D. 275, 291–92 (D. Md. 2008).

[11] "Though surreplies are generally not permitted, *see* Local Rule 105.2(a), the Court in its discretion may allow a party to file a surreply." *Boland v. Amazon.com Sales, Inc.*, 628 F. Supp. 3d 595, 599 (D. Md. 2022); Loc. R. 105.2(a) (D. Md. 2025) ("Unless otherwise ordered by the Court, surreply memoranda are not permitted to be filed."). "This discretion is typically used in the interest of fairness to permit parties to respond to new matters raised for the first time in the opposing parties' reply briefs." *Boland*, 628 F. Supp. 3d at 599. Because Amazon's reply addressed a relevant Fourth Circuit case, *Stafford v. Bojangles' Restaurants, Inc.*, 123 F.4th 671 (4th Cir. 2024), which was issued "one day after Plaintiff filed her opposition," ECF 90, at 1, the Court deems this to be a case in which an exercise of discretion permitting Martinez to file a surreply is warranted.

questions to the extent 'that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'" *EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013)).

"Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *see also In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 344 (D. Md. 2012). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. at 344 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311). The Fourth Circuit has held that a district court's failure to resolve a threshold legal question "for commonality purposes" amounted to a "premature" certification because the court could not "definitively determine that the requirements of Rule 23 have been satisfied." *EQT Prod. Co.*, 764 F.3d at 361; *see also In re Marriott Int'l.*, 78 F.4th at 687 (noting that "even if a class-waiver defense is treated as a merits question, that does not mean it should not be resolved at the certification stage," and finding that the district court erred by "declining to rule on Marriott's waiver defense before certifying a class against it"); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004) (noting that "with the potential for individualized reliance determinations having to be made under the law of at least six different States, the district court did not explain why it could find the predominance requirement satisfied" and remanding for the court to make that the determination of which law applied prior to class certification); *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 148–49 (4th Cir. 2001) (determining the availability of the contributory negligence defense under state law was necessary to evaluate predominance).

Upon reconsideration, the Court agrees with Amazon that to fully evaluate whether "common questions of law or fact predominate over any questions affecting only individual class members," *Lienhart*, 255 F.3d at 147 (brackets and ellipses omitted), the better course is to first resolve the legal questions of (1) whether the *de minimis* defense applied to the Maryland Wage Laws and (2) Amazon's "straight time" argument before certifying the class. The Supreme Court of Maryland answered the first question in the affirmative. *Martinez*, 338 A.3d at 655. This Court now addresses the second question to aid its reconsideration of predominance.

*i. The Maryland Wage Laws*

The Court begins by examining "the elements of the underlying cause of action." *Halliburton Co.*, 563 U.S. at 809. Doing so requires some background on a related federal law: the Fair Labor Standards Act ("FLSA").

"In 1938, the United States Congress enacted the FLSA." *Amaya v. DGS Constr., LLC*, 278 A.3d 1216, 1232 (Md. 2022). "As originally enacted, the FLSA established a minimum wage, and required that employers engaged in commerce or in the production of goods for commerce provide employees overtime compensation for each hour worked beyond a forty-hour workweek." *Id.* at 1233 (internal citations omitted). "The FLSA, as originally enacted and [as] is still the case today, does not define the term 'work.'" *Id.* In *Anderson v. Mt. Clemens Pottery Co.*, the United States Supreme Court "addressed working time for purposes of the FLSA and whether employees of a pottery plant were entitled to compensation for time spent walking to and from the time clock to their working places." *Amaya*, 278 A.3d at 1234 (citing *Anderson*, 328 U.S. at 682–83). The Supreme Court determined that the employees had demonstrated that they were required to be on the premises for some time prior to, and after, their scheduled working hours and "the time spent

in these activities must be accorded appropriate compensation." *Id.* (citing *Anderson*, 328 U.S. at 690–91).

"The following year, in 1947, Congress responded by passing the [Portal-to-Portal Act ("PPA")], amending certain provisions of the FLSA and relieving employers of liability under the FLSA," to some extent. *Amaya*, 278 A.3d at 1234. The PPA excluded from FLSA liability activities including (1) "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" and (2) "activities which are preliminary to or postliminary to said principal activity or activities." *Id.* at 1234–35 (quoting 29 U.S.C. § 254(a)).

"In 1965 and 1966, respectively, the General Assembly enacted the [MWHL] and the [MWPCL.]" *Martinez*, 338 A.3d at 645; *see also Butler v. PP&G, Inc.*, Civ. No. JRR-20-3084, 2023 WL 3580374, at *4 (D. Md. May 22, 2023) (quoting *Amaya*, 278 A.3d at 1239). "The MWHL, among other things, establishes employers' obligations to pay a minimum wage and overtime." *Martinez*, 338 A.3d at 645 (citing Md. Code Ann., Lab. & Empl. ("LE") §§ 3-413, 3-415); *see also Guzman v. KP Stoneymill, Inc.*, Civ. No. PX-20-2410, 2024 WL 229564, at *4 (D. Md. Jan. 22, 2024) ("The FLSA and MWHL require employers to pay non-exempt employees minimum wage for all hours worked, and overtime pay of at least one and one-half times the regular wage for hours worked in excess of 40 hours per week." (citing LE §§ 3-413(b), 3-415(a))). The MWHL requires employers to pay employees an overtime wage of at least 1.5 times the usual hourly wage, LE § 3-415(a), and grants employees a private right of action to recover the difference between "the wage paid to the employee and the wage required" under the MWHL, LE § 3-427(a). The MWHL "references the FLSA in several places," *Martinez*, 338 A.3d at 645 (citing various provisions of the MWHL), and the Supreme Court of Maryland has described the

MWHL "as the State 'equivalent,' 'parallel,' 'partner,' and 'counterpart' of the FLSA," *id.* at 650 (collecting cases). *See also Guzman*, 2024 WL 229564, at *4 ("The MWHL 'is the state's equivalent of the FLSA' and its pleading requirements 'mirror those of the federal law.'" (internal citations omitted)).

"The MWPCL governs the timing of wage payments and employers' obligations to pay wages when an employee is terminated." *Martinez*, 338 A.3d at 645 (citing LE §§ 3-502, 3-505). Specifically, it requires employers to establish regular pay periods and establishes a private right of action for employees to recover unpaid wages that are more than two weeks late. *See* LE § 3-507.2(a) ("[I]f an employer fails to pay an employee in accordance with § 3-502 or § 3-505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages."). Both the MWHL and MWPCL "define '[w]age' as 'all compensation that is due to an employee for employment.'" *Martinez*, 338 A.3d at 645 (citing LE §§ 3-401(d), 3-501(c)(1)). "Read together, these statutes allow employees to recover unlawfully withheld wages from their employer, and provide an employee with two avenues to do so." *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 625 (Md. 2014).

The Supreme Court of Maryland has held that "the PPA, in particular the exclusion of certain activities as compensable as set forth in 29 U.S.C. § 254(a), has not been adopted or incorporated into the MWHL, the MWPCL, or in [the Code of Maryland Regulations ("COMAR")]." *Amaya*, 278 A.3d at 1239–40. So "although the MWHL may be Maryland's counterpart of the FLSA, the General Assembly has not enacted an equivalent of the PPA in Maryland, and the General Assembly did not incorporate, either partially or entirely, the provisions of the PPA by reference." *Id.* at 1242.

*ii. "Straight Time" Argument*

Amazon advances the seemingly novel argument that "even if security screening time is generally compensable, Amazon owes nothing at all (*i.e.*, there is no liability) unless a given putative class member's screening time resulted in them working over 40 hours per workweek *or* the additional time made the putative class member's 'average hourly wage rate in any given workweek dip[] below Maryland's minimum wage.'" ECF 81-1, at 19 (emphasis in original) (quoting ECF 50, at 16).[12] Amazon asserts that "Maryland law only requires that Plaintiff is owed the *minimum wage* for non-overtime or 'straight' time violations." ECF 50, at 19 (emphasis in original) (first citing Md. Code Ann., Lab. & Empl. § 3-413; and then citing *Bocangel v. Warm Heart Family Assistance Living, Inc.*, Civ. No. PX-16-03989, 2021 WL 100700, at *2 (D. Md. Jan. 12, 2021)). Thus, Amazon argues, "[f]or weeks Plaintiff worked less than 40 hours with security screening time added in, she would have to prove she was paid less than a minimum wage for all hours worked." *Id.* And because "it is undisputed that Amazon's $15 per hour minimum wage for all putative class members beginning November 1, 2018 . . . was well above the required Maryland minimum wage for the time period at issue ($10.10 per hour in December 2018, and $11.00 per hour in 2019 and 2020)," Amazon argues that "it is highly unlikely that this showing could be made for any putative class member." *Id.* at 19 n.8. Martinez "disagrees based on her claim under the MWPCL," which she asserts "provides for the award of a workers' full regular hourly rate of pay." ECF 58, at 11. The substance of Martinez's disagreement is provided in a

[12] Amazon makes its "straight time" argument in its opposition to Martinez's motion for class certification, ECF 50, and again in its request for the Court to reconsider granting that motion, ECF 81-1. However, Amazon does not appear to advance this argument as a basis for summary judgment, *see generally* ECFs 43, 59 & 98, and so the Court addresses the argument only in the context of its reconsideration of the class certification.

footnote, *id.* at 11 n.9, which she largely reproduces in her opposition to Amazon's motion for reconsideration, ECF 86, at 14 n.6.

"When confronted with uncertain state law, a federal court sitting in diversity jurisdiction must predict what course the highest court in the state would take." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 662 (E.D. Va. 2015). "The federal court may base its prediction on 'canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions.'" *Id.* (quoting *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir.1999)). "[C]ases from other jurisdictions can also provide guidance." *Id.* (citing *Warren Bros. Co. v. Cardi Corp.*, 471 F.2d 1304, 1307–08 (1st Cir. 1973)).

(1) MWHL Claim

To the extent that Martinez brings an overtime claim under the MWHL, Amazon's "straight-time" argument appears to be correct insofar as an element of that claim is that the employee worked more than forty hours in at least a single workweek. "The requirements for an overtime claim under the MWHL, 'essentially the state parallel of the FLSA,' are the same." *Bobb v. FinePoints Priv. Duty Healthcare, LLC*, Civ. No. JKB-23-03129, 2025 WL 2300719, at *5 (D. Md. Aug. 8, 2025) (citing *Gonzalez Cabrera v. Vargas Servs., LLC*, Civ. No. GLR-24-3200, 2025 WL 1569957, at *3 (D. Md. June 3, 2025)). "To prevail on a claim of unpaid overtime wages under the FLSA, a plaintiff must show (1) that she was employed by the defendant, (2) *that she worked more than forty hours in at least a single workweek*, (3) without receiving overtime pay of one-and-a-half times her regular salary, and (4) that the defendant had knowledge (actual or constructive) of the overtime work." *Id.* at *5 (emphasis added).

"Under the FLSA and the MWHL, an employee may recover unpaid straight-time wages from an employer in certain circumstances." *Altes v. Pride Ctr. of Maryland, Inc.*, 693 F. Supp. 3d 511 (D. Md.) (citing *Conner v. Cleveland Cnty.*, 22 F.4.th 412, 421 (4th Cir. 2022)), *vacated in part*, 705 F. Supp. 3d 503 (D. Md. 2023). "In addition to seeking unpaid overtime compensation, employees may seek to recover wages for uncompensated hours worked that 'fall between the minimum wage and the overtime provisions of the FLSA,' otherwise known as 'gap time.'" *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3rd Cir. 2014) (quoting *Adair v. City of Kirkland*, 185 F.3d 1055, 1062 (9th Cir. 1999)). "Gap time 'refers to time that is not [directly] covered by the [FLSA's] overtime provisions because it does not exceed the overtime limit, and to time that is not covered by the [FLSA's] minimum wage provisions because . . . the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked.'" *Conner*, 22 F.4th at 421 (alterations in original) (quoting *Davis*, 765 F.3d at 243–44).

"There are two types of gap time—pure gap time and overtime gap time. In pure gap time claims, the employee seeks to recover for unpaid straight time in a week in which they worked no overtime." *Conner*, 22 F.4th at 421. "In overtime gap time claims, the employee seeks to recover unpaid straight time for a week in which they *did* work overtime." *Id.* (emphasis in original). "Courts widely agree that there is no cause of action under the FLSA for 'pure' gap time wages—that is, wages for unpaid work during pay periods without overtime." *Davis*, 765 F.3d at 244. "Rather, a 'claim to [pure] gap time compensation is enforceable only under' state law related to the parties' employment agreement." *Conner*, 22 F.4th at 421 (quoting *Monahan v. Cnty. of Chesterfield*, 95 F.3d 1263, 1283 (4th Cir. 1996)).

This Court has held that "requirements under the MWHL mirror those of the federal law," meaning that "the MWHL stands or falls on the success of [claims] under the FLSA." *Turner v.*

*Hum. Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003). Accordingly, the Court agrees that with respect to those claims, some members of the class will not be able to establish liability pursuant to the MWHL overtime cause of action if they cannot show that they were not paid "at least the greater of" the federal or state minimum wage. *See* LE § 3-413(b). However, as discussed next, the Court sees no reason to graft those same constraints onto the MWPCL.

(2) MWPCL Claim

The MWPCL "permits employees to recover for unpaid straight time as well as overtime." *Bobb*, 2025 WL 2300719, at *6; *see also Altes*, 693 F. Supp. 3d at 518 ("The MWPCL also provides a private right of action for the recovery of straight-time wages."). Under the MWPCL, "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment." Md. Code Ann., Lab & Empl. § 3-505(a); *see also id.* § 3-507.2(a) ("[I]f an employer fails to pay an employee in accordance with § 3–502 or § 3–505 of this subtitle, after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages."). "To prove the failure to pay all wages timely and regularly under the MWPCL, a plaintiff must establish that the employer failed to pay its employees regularly while they were employed and in full at the termination of their employment." *Aguilar v. David E. Harvey Builders, Inc.*, Civ. No. GLS-18-03953, 2023 WL 7166312 (D. Md. Oct. 31, 2023) (first citing *Peters*, 97 A.3d at 625–26; and then citing *Marshall v. Safeway*, 88 A.3d 735, 746–47 (Md. 2014)). "For uncompensated regular time under the MWPCL, the employee may 'recover the unpaid wages' from the employer." *Avila v. Marlin Lighting LLC*, No. PWG-22-49, 2022 WL 17094583, at *3 (D. Md. Nov. 21, 2022) (citing LE § 3-507.2(a)).

"Wage" is defined broadly in the Maryland Code as "all compensation that is due to an employee for employment," including a "bonus," "commission," "fringe benefit," "overtime wages" or "any other remuneration promised for service." LE § 3-501(c). The Supreme Court of Maryland has likewise stated "the wages which an employee is due, and which must be paid on termination of employment, *consist of all compensation*, and any other remuneration, *that the employee was promised* in exchange for his work." *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671–72 (Md. 2001) (emphasis added). "In other words, . . . to be wages, 'to be included within the statute, the payment must have been promised to the employee as compensation for work performed.'" *Id.* at 672. Thus, the entitlement to straight-time wages under the MWPCL does not necessarily turn on how many hours the employee worked or what the minimum wage was, but rather what the employer promised. *See id.*

Accordingly, this Court has observed that "[f]or the unpaid regular time recoverable under the MWPCL, the Court takes the hours worked without compensation and multiplies that figure by the employee's base hourly rate." *Mata v. G.O. Contractors Grp., Ltd.*, Civ. No. TDC-14-3287, 2015 WL 6674650, at *5 (D. Md. Oct. 29, 2015). Moreover, the Maryland Code and corresponding pattern jury instructions anticipate calculation of the amount of unpaid wages owed using an employee's "usually hourly rate," rather than the statutory minimum wage in place at the time. *See* COMAR 09.12.41.19.A–B ("'Regular hourly rate' means the usual hourly rate. [] The regular hourly rate is determined by dividing the total compensation for employment in any workweek by the total number of hours worked in that workweek."); Md. Civ. Pattern Jury Instructions § 22:3(J), *Regular Hourly Rate* (same). And as Martinez observes, this Court has awarded plaintiffs their full wages under the MWPCL, including for regular hours, without regard for the minimum wage. *See Aguilar*, 2023 WL 7166312, at *19–21.

Amazon cites only two legal authorities for its position: § 3-413 of the Labor and Employment Article ("Section 3-413"), and *Bocangel*, 2021 WL 100700, at *2. *See* ECF 50, at 19. Section 3-413, however, is a provision of the MWHL, which, as the Court has explained, comports with Amazon's view of the law because it runs parallel to the FLSA. *See, e.g.*, *Martinez*, 338 A.3d at 645 ("The MWHL, among other things, establishes employers' obligations to pay a minimum wage and overtime. LE §§ 3-413, 3-415."); *Morris v. King Oak Enters., Inc.*, Civ. No. AAQ-24-00782, 2024 WL 4476303, at *3 (D. Md. Oct. 11, 2024). A different subtitle of the Labor and Employment Article governs the MWPCL, *see Martinez*, 338 A.3d at 645, and Amazon does not establish the textual basis for its novel interpretation of that statute. Regarding *Bocangel*, Amazon identifies it as a case in which "the plaintiff's straight time claim was for minimum wage violations" "under Maryland wage and hours laws." ECF 50, at 19. But in *Bocangel*, it was clear that neither plaintiff had "been paid a legal minimum or overtime wage." 2021 WL 100700, at *3. So, the minimum wage was necessarily relevant in determining what wages the plaintiffs were owed. *See id.* at *3–4. Accordingly, *Bocangel* is of little help here.

Thus, while the FLSA and MWHL may not provide a cause of action for unpaid "straight time" except through an overtime or minimum wage claim, the Court concludes that Amazon was nevertheless required to pay the wages promised for hours worked pursuant to a non-overtime claim under the MWPCL, regardless of the amount of the wage or the total hours worked by the employee during the workweek at issue.

4. Reconsideration of Certification

With the answer to those threshold legal questions in hand, the Court reconsiders whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed R. Civ. P. 23(b)(3). Martinez's proposed class is as follows:

> All individuals (or "associates") who, during *any time* between November 18, 2018 and March 31, 2020, were employed by Defendant at its BWI2 (2010 Broening Highway, Baltimore, MD 21224), DCA1 (1700 Sparrows Point Boulevard, Sparrows Point, MD 21219), or MDT2 (600 Principio Parkway West, North East, MD 21901) Maryland fulfillment centers and paid an hourly wage.

ECF 44-15, at 1 (emphasis added). Upon reconsideration of the matter, and based upon new Fourth Circuit precedent, the Court concludes that Martinez's motion for class certification should be denied.

*i. The Court's Original Analysis and New Fourth Circuit Precedent*

The Court begins with the *de minimis* doctrine, and the potential consideration of the individual choices of class members with respect to the security screenings. Although the question of whether the *de minimis* doctrine applied to Maryland Wage Laws had not yet been resolved, the Court did originally consider whether that doctrine could defeat predominance. *See Martinez*, 2024 WL 4817214, at *12 ("While the application of the *de minimis* defense may be relevant to liability as to each individual plaintiff's claim, the Court does not find that these individualized liability and damages issues predominate over the threshold liability issues capable of class-wide determination."). The Court relied primarily on three cases to reach the conclusion that the "individualized liability and damages issue" accompanying the *de minimis* doctrine would not predominate over issues common to the class: *Alfonso v. FedEx Group Package Sys., Inc.*, No. 21-cv-01644, 2024 WL 1007220 (D. Conn. March 8, 2024); *Davis v. Target Corp.*, Civ. No. 23-89, 2023 WL 8373162 (E.D. Pa. Dec. 1, 2023); and *Ornelas v. Tapestry, Inc.*, Civ. No. 18-6453, 2021 WL 3471173 (N.D. Cal. Aug. 6, 2021).

In *Alfonso*, the plaintiffs challenged uncompensated time related to "a common policy that subjected all individuals included in the class definition to security screenings upon entry to and exit from a facility." 2024 WL 1007220, at *14. The District of Connecticut considered whether

the *de minimis* doctrine's application to Connecticut's wage law would defeat predominance. *Id.* The court observed that "how much time an employee actually spent going through security and walking to a time clock or punch station, and whether that time is *de minimis* (and therefore non-compensable) may require a more individualized analysis." *Id.* For example, there was "no doubt a wide variation in the available routes taken by employees and times those routes took to walk based on the expert reports—as many as 124 routes, ranging from a few seconds to potentially up to 12 or more minutes in a day." *Id.*

However, the *Alfonso* court noted that the plaintiffs "provided expert reports . . . which demonstrate how Plaintiffs would seek to demonstrate liability (as to the potential *de minimis* question) and damages through representative proof." *Id.* As such, "[t]o the extent that the defendant would 'challenge these reports as "unrepresentative or inaccurate,' that in itself is a defense 'common to the claims made by all class members.'" *Id.* (quoting *Tyson Foods*, 577 U.S. at 457). Further, the court concluded that "the factual matter of the time spent in security and walking time generally goes to damages, and therefore cannot 'alone' preclude certification." *Id.* (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 409 (2d Cir. 2015)). The *Alfonso* court observed that "three legal questions will apply to the whole class, and ultimately predominate over the individualized issues": "the existence of a common policy that subjected all individuals included in the class definition to security screenings upon entry to and exit from a facility," "the compensability of security and walking time," and "whether the *de minimis* defense" was applicable to the state wage law. *Id.* at *14.

Next, *Davis* was "a wage-and-hour case involving current and former employees working in a large warehouse" who would "enter the warehouse through a single entrance, walk for seven minutes or so to a designated time clock, and punch in." 2023 WL 8373162, at *1. "By policy,

[employees were] not paid for the walking time, even when it[ was] overtime." *Id.* The defendant argued that "for any workweek of any given employee, there may or may not be compensable overtime, and the compensable amount may be different." *Id.* Relying on the Supreme Court's decision in *Tyson Foods*, the Eastern District of Pennsylvania rejected the defendant's argument, and held that "the central question of whether the relevant time is categorically compensable predominates over individual differences in liability or damages." *Id.* at *5.

Finally, in *Ornelas*, the Northern District of California considered class certification in a case involving "current and former non-exempt California employees of defendant's high-end retail clothing stores for claims of unpaid wages and overtime arising out of defendant's employee security check policy." 2021 WL 3471173, at *6. There, the court rejected the defendant's "three arguments as to why individual issues would predominate." *Id.* at *5. "*First*, [the] defendant argue[d] that the bag-and-coat-check policy did not *require* the checks to be done off-the-clock[.]" *Id.* (emphasis in original). The court reasoned that "[t]hose points [went] to the merits, not whether the claims can be tried on a class basis," and the "uniform written policy" applied "to all class members." *Id.* "*Second*, [the *Ornelas*] defendant provide[d] several individual employee declarations to the effect that the bag and coat check policy was not uniformly administered." *Id.* (emphasis in original). However, the court found that the evidence did not support the defendant's contention that the policy was not uniformly administered. *See id.* Third and most relevant here, the defendant argued "that individualized proof will be needed to address its defense that any unpaid time spent in the security screening was *de minimis* and, therefore, not compensable." *Id.* at *6. Importantly, the court observed that "the question of whether the *de minimis* defense is even applicable is a common and predominating one that can be litigated on a class-wide basis." *Id.* Further, the court acknowledged that "[i]n the event that defendant loses on the merits, it will be

necessary to litigate the issue of who actually stood in line and for how long"—but the court noted that it was "prepared . . . to give defendant its day in court" to try those factual issues, and did not find them to predominate. *Id.*

Amazon argues that the above decisions "are incompatible with binding Fourth Circuit case law." ECF 81-1, at 16. For example, the Fourth Circuit has remarked that "although class litigation may address the 'incentive problem' that arises when individual plaintiffs do not have enough at stake to justify individual litigation, that benefit, too, is diminished by issue certifications 'where the remaining individualized issues will also require significant resources.'" *In re Marriott Int'l*, 78 F.4th at 689 (quoting *Romig v. Pella Corp.*, No. 14-cv-00433, 2016 WL 3125472, at *17 (D.S.C. June 3, 2016)). Accordingly, in the context of affirmative defenses, the Fourth Circuit has noted that "when the defendant's 'affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case,' class certification is erroneous." *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (quoting *In re Northern Dist. of Cal. Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853 (9th Cir. 1982)); *see also Thorn*, 445 F.3d at 321 ("[T]he record must affirmatively reveal that resolution of the statute of limitations defense on its merits may be accomplished on a class-wide basis.").

Further, Amazon takes issue with the reasoning in the district court cases the Court previously relied upon. Specifically, Amazon argues that the reasoning in *Alfonso* "ignore[s] Amazon's due process rights to present individualized defenses" and "contradicts governing case law holding that 'class certification is erroneous' where a defendant's affirmative defenses 'may depend on facts peculiar to each plaintiff's case.'" ECF 81-1, at 17 (quoting *Broussard.*, 155 F.3d at 342). Moreover, Amazon disputes the *Ornelas* court's reasoning that "'the threshold question of whether the *de minimis* defense can even be applied' is common" because "that reasoning would

always establish predominance if adopted." *Id.* at 18. "What matters" instead, Amazon suggests, is "whether *common evidence* can lead to common resolution of those elements or defenses." *Id.* (emphasis in original).

To be sure, the Court did consider the question of whether common evidence could lead to the resolution of liability in initially certifying the class. *See Martinez*, 2024 WL 4817214, at *11–12. And as the Court originally observed, Martinez has provided an expert report attempting to demonstrate how she will seek to demonstrate liability and damages through representative proof. *See* ECF 58, at 14–17. The Supreme Court's affirmation of class certification in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), offers some guidance on this point. In *Tyson Foods*, the Supreme Court considered whether the "necessarily person-specific inquiries into individual work time predominate[d] over the common questions raised by respondents' claims" under the FLSA. *Id.* at 454. Specifically, in order "[t]o be entitled to recovery, . . . each employee [had to] prove that the amount of time spent donning and doffing, when added to his or her regular hours, amounted to more than 40 hours in a given week."[13] *Id.* The "[r]espondents counter[ed] that these individual inquiries are unnecessary because it can be assumed each employee donned and doffed for the same average time observed in" an expert's sample. *Id.* That argument begged the question of whether such a representative sample could establish class-wide proof. *See id.* The Court reasoned that "a permissible method of proving classwide liability is by showing that each class member could have relied on that sample to establish liability if he or she had brought an individual action." *Id.* at 455; *see also id.* at 458 (observing that to the contrary, in *Wal-Mart Stores, Inc. v.*

[13] In *Tyson Foods*, the district court found that "common questions susceptible to classwide resolution, such as 'whether the donning and doffing of [protective gear] is considered work under the FLSA, whether such work is integral and [in]dispensable, and whether any compensable work is de minim[i]s.'" 577 U.S. at 448–49 (brackets in original) (citing *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d 870, 899 (N.D. Iowa 2008)).

*Dukes*, 564 U.S. 338 (2011), "the employees were not similarly situated," so "none of them could have prevailed in an individual suit by relying on depositions detailing the ways in which other employees were discriminated against by their particular store managers").

Amazon suggests that *Tyson Foods* is inapposite because the employees there, relying on representative evidence, "spent roughly equal time donning and doffing" and thus "each class member could have relied on" the evidence "to establish liability if he or she had brought an individual action." ECF 89, at 14–15 (emphasis omitted) (quoting *Tyson Foods*, 577 U.S. at 455). Amazon contends that Martinez asserts, "[w]ithout explanation," that "'representative proof and mathematical computation' are available to resolve liability here.'" *Id.* at 15 (citation omitted). Instead, Amazon argues that Martinez's case is more analogous to that considered by the Ninth Circuit in *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217 (9th Cir. 2024). *Id.* at 18.

*Miles* "provides two dueling and instructive examples of when a claim challenging a company's policy can—and cannot—be certified" in the Ninth Circuit. 89 F.4th at 1220. The lawsuit in *Miles* "allege[d] that two employee policies at Kirkland's Stores violate California law": (1) a policy requiring "employees to take rest breaks on store property (the 'Rest Break Claim')," and (2) a policy requiring "them to surrender to bag checks when they ended their shift (the 'Bag Check Claim')." *Id.* For the Rest Break Claim, the Ninth Circuit reversed the district court's decision not to certify the class on predominance grounds, concluding that "the evidence shows that Kirkland's applied its rest break policy uniformly across its stores." *Id.* In contrast, the Ninth Circuit affirmed the district court's denial of class certification for the Bag Check Claim, reasoning that, in addition to its inconsistent enforcement, "the very nature of [the bag check] policy—with the inherent variations in employees' circumstances—may require highly individualized inquiries." *Id.*; *see also id.* at 1225 ("Some policies by their nature may implicate each proposed

class member's personal preferences, practices, or proclivities, casting doubt on the viability of class treatment.").

In two recent cases, the Court of Appeals for the Fourth Circuit explored when and whether a company policy lends itself to Rule 23 class treatment. First, in *Stafford v. Bojangles*, 123 F.4th 671 (4th Cir. 2024),[14] the Fourth Circuit "held that relying solely on overly generalized company policies will typically defeat class-action certification because these formulations too often disguise the dissimilarity of prospective class members." *Overby*, 178 F.4th at 178. Second, in *Overby v. Anheuser-Busch, LLC*, the appellate court expanded on that principle by addressing another challenge to class certification raised by a prominent brewing company "concerning its alleged failure to compensate employees for a host of pre- and post-shift work activities." *Id.* There, the Fourth Circuit elucidated "the requisite specificity district courts must employ in Rule 23 predominance and commonality analyses." *Id.* The defendant in *Overby* required "hourly employees [to] swipe a badge and enter through a turnstile" to access brewery premises, and that swipe data was stored in an "electronic timekeeping system." *Id.* The defendant did "not compensate employees according to this swipe data," but rather generally paid "employees only for scheduled shift hours." *Id.* The brewery operated "continuously with three shifts: a day shift from 7:00am to 3:00pm, an afternoon shift from 3:00pm to 11:00pm, and a night shift from 11:00pm to 7:00am." *Id.* at 178–79. While in the industrial spaces at the brewery, employees were required to "wear various personal protective equipment ('PPE')." *Id.* at 179. Employees in all five departments at the brewery were required to don certain common PPE, but certain roles required "additional PPE," and employees varied in when and how the donned and doffed these

[14] The undersigned sat by designation on the deciding panel for *Bojangles*.

pieces. *See id.* During COVID-19, the brewery also "required temperature checks, face coverings, handwashing, and shoe sanitization before entry." *Id.*

The named plaintiffs in *Overby* brought suit against the brewing company under Virginia wage laws and the FLSA, alleging that the company failed to compensate plaintiffs for all mandatory pre- and post-shift work. *See id.* at 179. The plaintiffs' claims involved "three analytical steps." *Id.* "First, plaintiffs allege that the company has various requirements that must be met before employees arrive at their workstation and after they leave the workstation," including "donning/doffing PPE, complying with the COVID-19 health protocols, partaking in shift-handoff meetings, and securing and putting away tools." *Id.* Second, because the defendant required "employees to be present and working at their designated station the moment their shift starts until the moment their shift concludes, preparatory and cleanup steps necessarily fall outside shift hours." *Id.* And third, because the defendant did "not automatically compensate employees beyond the eight-hour shift, plaintiffs have not received pay for compensable pre- and post-shift work." *Id.* "Except for threshold PPE and COVID-19 protocols, hourly workers d[id] not all claim to perform the same categories of pre- and post-shift work." *Id.* Additionally, the proposed class "swept in employees hired after the Brewery's cessation of COVID-19-related practices." *Id.*

Re-emphasizing the Fourth Circuit's holding in *Bojangles*, the *Overby* court stated that "a key safeguard embedded in our commonality and predominance analyses is eschewing overly general articulations of common questions, including alleged company policies." *Id.* at 182. With that "precept in mind," the Fourth Circuit observed that the alleged common question required one to "circularly assume that all class members in fact performed off-shift work and that [the defendant] required the work to be performed off-shift." *Id.* at 182–83. In other words, it was "impossible to resolve this alleged common question without first answering a number of threshold

inquiries: Did the employee don and doff PPE on Brewery premises outside of shift hours? Did the employee perform mandatory handoff or carryover meetings outside of shift hours? Did the employee work during the period in which Anheuser-Busch mandated COVID-19 health policies?" *Id.* at 183. The Fourth Circuit observed that those questions had "no common answer" and "involve[d] more particularized engagement with the record and reveal significant variation amongst prospective class members." *Id.* Further, the variation in answers to those questions came "in three different flavors: (1) whether class members performed specific categories of mandatory pre- or post-shift work *at all*, (2) where/when class members performed that off-shift work; and (3) what legal standards class members were subject to during the relevant employment periods." *Id.* (emphasis in original). Accordingly, compensability could not be determined "without looking at individual employee behavior," and the trial court's certification order was remanded. *Id.* at 184–185.

*ii. Application to Class Certification*

With the above precedent in mind, the Court returns to the present case. Amazon's security screening policy is similar to the bag check policy examined in *Miles* in some respects. For example, like policy in *Miles*, Amazon's security screenings' application to, and effect on, employees depended in part on the employees' personal choices, such as whether the "employee brought a bag to work." *See Miles*, 89 F.4th at 1225. But unlike the bag check policy in *Miles*, it is undisputed that, at least at the three fulfillment centers at which the proposed class members worked, Amazon uniformly enforced a security screening policy on nearly all workers who exited the premises. *See* ECF 50, at 9; ECF 51-1, at 5, 81:3–18, at 15, 121:1–6. The policy at issue here does not, for example, require the Court "to embark on a time-intensive mission to figure out . . .

which stores and managers enforced" the policy or on "what days th[e] policy was enforced," for example. *See Miles*, 89 F.4th at 1225.

Amazon is correct, however, that unlike *Tyson Foods*, where "employees spent roughly equal time" engaging in the activity at issue, 577 U.S. at 459, the time Martinez spent exiting ranged from "a second" to allegedly 37 minutes in a day. *See, e.g.*, ECF 50-6 (Decl. of Regina Parol), at 2 ¶¶ 4–6; ECF 44-9, at 7 (App'x A). Martinez suggests, in contrast, that the calculation of time "can be completed based on the review of Amazon's objective payroll and timekeeping data for each class member taking into account any variations that may occur based on Amazon's uniform rounding practices." ECF 58, at 14–15 (citing ECF 44-9, Ms. Fox's report). Martinez points to Ms. Fox's report, which calculated the value of the wages associated with the time between when Martinez clocked out each day and when she swiped out to exit the facility after completing the post-shift security screening process. ECF 44-1, at 16; ECF 44-9, at 3. Ms. Fox's report indicates that "if similar data files were produced for additional employees who worked at Amazon fulfillment centers in Maryland, the same analysis used to prepare this report could be applied to the new data files on a class-wide basis." ECF 44-9, at 3. According to the data Ms. Fox collected, "an average of 3.70 minutes per day expired between the time when" 14 class members "clocked-out at the pre-screening time clock and [the] time they badged-out to exit the facility" or, after Amazon's rounding rules were applied, "an average of 3.80 unpaid minutes per day." ECF 58, at 15 (emphasis omitted) (citing ECF 58-1, at 3 ¶ 4).

The Court agrees with Martinez that the mere fact that the *de minimis* rule applies to the Maryland Wage Laws does not "preclude collective treatment for the purpose of resolving the common issue that *does* exist, and that must be answered in the first instance." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1116 (9th Cir. 2018) (emphasis in original); *see also Stiller v.*

*Costco Wholesale Corp.*, 298 F.R.D. 611, 632 (S.D. Cal. 2014), ("[W]here employees report a common experience—such as donning/doffing without pay—the issue of whether the time employees spent engaged in that experience was *de-minimis* may [be] determined by common proof."), *aff'd*, 673 F. App'x 783 (9th Cir. 2017) (emphasis added). The Ninth Circuit has observed that distinctions related to *de minimis* determinations under the FLSA "go to the individualized calculation of damages or the individualized application of defenses," and thus do not alone warrant decertification of a class. *Campbell*, 903 F.3d at 1116. The Fourth Circuit has likewise observed that "individualized damages inquiries alone usually remain insufficient to defeat class certification," although a Court "must first assure itself that such practices are sufficiently uniform across class members." *Overby*, 178 F.4th, at 184 ("For example, while each employee might spend different amounts of time performing any given task, a court can resolve this issue by employing statistical averages or by bifurcating liability and damages trials.").

However, the problem for Martinez is not the *de minimis* inquiry itself as applied to a particular activity, but rather that the question of liability for putative class members has "no common answer" because it "involve[s] more particularized engagement with the record and reveal[s] significant variation amongst prospective class members." *Overby*, 178 F.4th, at 183; *see also Tyson Foods*, 577 U.S. at 455 (noting that evidence must be of the type "each class member could have relied on . . . to establish liability if he or she had brought an individual action"). It is undisputed that Amazon applied its security screenings at the centers at issue to almost all the proposed class members. *See* ECF 50, at 9; ECF 51-1, at 5, 81:3–18, at 14, 121:1–6. But "the mere fact that the defendants engaged in uniform conduct is not, by itself, sufficient to satisfy Rule 23(b)(3)'s more demanding predominance requirement." *EQT Prod. Co.*, 764 F.3d at 366. "Even a plethora of identical practices will not satisfy the predominance requirement if

the defendants' common conduct has little bearing on the central issue in the litigation[.]" *Id.* Here, Amazon's security screenings and the common questions related to liability—namely, whether time spent in the screenings was "required" and thus can be considered "hours of work" under Maryland law and whether such time was *de minimis*—are directly related to the screenings Amazon applied to its employees at the relevant locations. The answer to those questions turns on individualized inquiries about what a class member chose to bring into work, which lane they used on any given day, whether and to what extent the employee was stopped during a screening, and what they did in between the time of punching out and swiping to exit—if such data is relied upon to establish liability, as plaintiffs represent it will be. "Such dissimilarity will preclude the generation of a common answer to the plaintiffs' common question." *EQT Prod. Co.*, 764 F.3d at 368; *see also Office of Gen. Treasurer on behalf of Emps. Ret. Sys. v. Boeing Co.*, 182 F.4th 422, 440 (4th Cir. 2026) (explaining that a plaintiff's "damages methodology must demonstrate how damages can be measured on a class-wide basis" and that this "doesn't mean the methodology can't include any individualized inputs like data points . . . [b]ut the methodology must explain how damages will be measured so that the district court can determine if class-wide issues predominate over individual ones").

Unlike an expert report that would establish the average time taken for an employee to travel through security upon exit, Martinez produces data that captures the time it took employees to travel from clock out ("Time Punch Data") to exit swipe ("Exit Swipe Data"). *See* ECF 43-5, at 2 ¶¶ 4–5. As discussed, the difference between those data sets does not necessarily capture the time the employee spent waiting in a security line because of the interceding activities that employees could engage in between the exit and security, including "using the restroom, going to the employee's locker, visiting a break room, or chatting with another employee." *Id.* at ¶ 6.

Because this sort of individualized evidence—i.e., punch-to-swipe data—purportedly exists for all members of the proposed putative class, the resolution of liability does not appear to turn on "common evidence." Thus, unlike in *Tyson Foods*, where the extent to which the defendant would challenge the representative evidence was "in itself [] a defense 'common to the claims made by all class members[,]'" *Alfonso*, 2024 WL 1007220, at *14 (citing *Tyson Foods*, 577 U.S. at 457), here the challenge to such representative evidence would necessarily be individualized,[15] because the punch-to-swipe data meaningfully varied amongst employees. *See, e.g.*, ECF 44-9.

For the foregoing reasons, the Court concludes that as it relates to the proposed class, "questions of law or fact common to class members" will not "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). However, the Court turns to the

[15] Amazon also takes issue with the "individualized inquiries . . . needed to determine whether any class member worked more than 40 hours in a given workweek, even after adding their security screening time to their recorded time," to resolve claims under the MWHL, in addition to other liability and damages-related inquiries. ECF 81-1, at 21; *see generally* ECF 81; ECF 89. But "damages determinations are individual in nearly all wage-and-hour class actions," *Leyva v. Medline Industries, Inc.*, 716 F.3d 510, 513 (9th Cir. 2013), and Martinez has identified "a damages model and report . . . that calculates the value of the wages associated with the time between when [Plaintiff] stopped getting paid each day and when she swiped out to exit the facility after completing the post-shift security screening process," ECF 44-1, at 16; ECF 44-9, at 3. Certainly, "where '[t]he functional equivalent of a full-blown trial on damages . . . for each putative class member would be required to determine to which individuals [the defendant] is liable,' the predominance requirement of Rule 23(b)(3) is not met." *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 460 (4th Cir. 2003) (quoting *Lienhart*, 255 F.3d at 149). But the Fourth Circuit has reached this conclusion in situations "where the issue of damages and impact does not lend itself to such a mechanical calculation." *Windham*, 565 F.2d at 68. As for the determination of whether class members worked more than 40 hours a week, the Court sees no reason why such a calculation would not be mechanical and capable of relatively efficient resolution in the class action context. However, the problem for Martinez (and the proposed class), is that the suggested damages model necessarily relies on data that captured a greater time than the potentially compensable activity challenged—so the issue of damages for each class member would not be "a mechanical calculation." *See id.* Rather, Amazon would challenge the damages amount for several putative class members, asserting that the time also comprised activities that were not compensable and leading to "a large number of separate mini-trials" on the issue of damages. *See Gunnells*, 348 F.3d at 460.

possibility of subclasses before ruling on Martinez's motion to certify the class upon reconsideration.

5. Subclasses[16]

Rule 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(3)(5). Plaintiff has not proposed subclasses. "While a district court does not 'bear the burden of constructing subclasses' in lieu of decertification, if it chooses to undertake that course *sua sponte* it must find that each subclass meets Rule 23's prerequisites individually." *Bojangles*, 123 F.4th at 683; *see also Connelly v. Amazon.com Servs., LLC*, No. 5:23-CV-02768-JMG, 2025 WL 693258, at *7 (E.D. Pa. Mar. 4, 2025) (with respect to screening, finding that "individualized liability problems" prevented the proposed class from being certified but "limiting the class to all people who clocked in with a physical time clock" to certify two proposed classes and subclasses). As the Fourth Circuit observed in *Overby*, employing subclasses is one tool at this Court's disposal to capture greater homogeneity among a class, and thus subclasses would be "more likely to survive Rule 23 scrutiny than the current sweeping class definition." *Overby*, 178 F.4th, at 185. Specific to the circumstances before it, the *Overby* Court further noted that "a subclass might include only employees present for the COVID-19 protocols or . . . employees subject to the distinctive requirements of a particular Brewery department." *Id.*

Here, natural subclasses for the Court's consideration are the users of each lane—i.e., the express lane, divestment lane, and bag scan lane users. However, these possible subsclasses present their own problems because "even if broken down by facility, [ ] the same employee may

[16] In its prior opinion, the Court did not reach the issue of whether subclasses were viable for this putative class action. *See* ECF 74, at 11.

have chosen to use different lanes on different days (i.e., some days using an express lane, others a bag lane, others a divestment lane) and there is no consistent characterization of their screening experiences, nor any record of the frequency at which they used each lane." ECF 50, at 27. Unlike the hypothetical subclass described in *Overby* for "employees subject to the distinctive requirements of a particular Brewery department," 178 F.4th at 185, employees here cannot be easily categorized into classes of users of specific lanes that experienced the policy in a uniform manner. Nor does the Court have sufficient information to analyze the numerosity of the subclasses it would *sua sponte* construct. The Court will not undertake Plaintiff's burden in this case to construct proper subclasses. *See id.* at *7 ("The district court may, in its discretion, find narrower subclasses properly tailored under Rule 23. Or it may deny class certification."). For the reasons noted above, the Court will grant the motion to reconsider its prior decision and deny Martinez's motion to certify the class upon reconsideration.

**B. Summary Judgment**

Counts I and II of Plaintiff's complaint raise claims under the MWPCL and the MWHL, respectively. Count III raises the common law claim of unjust enrichment. All three claims rise and fall with the question of whether Plaintiff has established an entitlement to compensation for time spent waiting in security lines.

1. The Parties' Arguments

In its original briefing, Amazon argues that the undisputed facts demonstrate that, although employees were required to walk through metal detectors upon exiting the fulfillment Floor, time spent waiting in a bag-lane or divestment lane was a result of the employee's own choices—not the employer's requirement. ECF 43, at 11–17. Alternatively, Amazon argues that if Plaintiff did establish that waiting in such lines constituted "hours worked," that such time is *de minimis* and

not compensable under the Maryland Wage Laws. *Id.* at 17–21. Martinez countered that: first, Amazon's arguments fail under the *Anderson v. Mt. Clemens Pottery Co.* burden shifting standard, ECF 51, at 15–19; second, that there are material facts in dispute as to whether Martinez had a meaningful choice to use the express lanes, and whether the express lanes resulted in less time on Amazon's premises, *id.* at 19–24; third, that the Court should not "create new state law" by recognizing an implicit *de minimis* exception that is not in the statute's plain text, *id.* at 24–30; and fourth, even if the *de minimis* exception is implied, Amazon's motion should still fail, *id.* at 31–34.

The Supreme Court of Maryland has now decided that the *de minimis* doctrine applies to claims brought under the Maryland Wage Laws. *Martinez*, 338 A.3d at 655. However, that court did not decide, pursuant to the confines of the certified question before it, "the scope of the *de minimis* rule under the Maryland Wage Laws." *Id.* at 34 n.13 (emphasis added). In supplemental briefing, Amazon argues that the *de minimis* doctrine "forecloses Plaintiff's claim to recover wages for the time she spent in brief, post-shift security screenings as a matter of law." ECF 98, at 4. Amazon contends that is so because "(i) it is undisputed that it was Plaintiff's choice to bring in a personal bag—Amazon did not require her to do so" and thus the additional screening time was not compensable, and (ii) even if that additional time was compensable 'work,' it too was so brief that it is not compensable under the *de minimis* doctrine." *Id.* at 4, 11 (citing COMAR 09.12.41.10) (emphasis added).

Amazon presents the factors identified by the Fourth Circuit in *Perez v. Mountaire Farms, Inc.*, 650 F.3d 350 (4th Cir. 2011), as the appropriate framework for the Court's application of the *de minimis* doctrine. ECF 98, at 9 ("[C]ourts will typically consider '(1) the practical difficulty the employer would encounter in recording the additional time; (2) the total amount of

compensable time; and (3) the regularity of the additional work.'" (quoting *Perez*, 650 F.3d at 373)). Martinez agrees that the *Perez* factors, along with a U.S. Department of Labor regulation outlining the *de minimis* defense, establish the appropriate scope of the doctrine. ECF 100, at 4–5 (citing 29 C.F.R. § 785.47 (1961)). Even so, Martinez argues that there is a genuine dispute of material fact as to whether, under the *Perez* factors, time spent in the security lines was *de minimis*. *See id.* at 5–12. Martinez further emphasizes that Amazon, as the employer, "bears the burden of demonstrating that the time at issue fits within the narrow confines of the *de minimis* defense." *Id.* at 5 (emphasis omitted).

2. Burden Shifting

As a threshold matter, Martinez argues that the Court should apply *Anderson*'s "burden-shifting framework" because Amazon "fail[ed] to maintain records or other evidence of alleged unpaid activities," specifically the "time in which Plaintiff and other class members started or completed the post-shift security screening process at its Maryland fulfillment centers." ECF 51, at 15–16. The Court disagrees that the *Anderson* framework is relevant to its resolution of the motion for summary judgment.

First, Martinez cites only one unreported Maryland Appellate Court case as authority for the proposition that Maryland courts apply the *Anderson* burden-shifting framework under the Maryland Wage Laws. *See* ECF 51, at 15–19; *East Over Car Wash, Inc. v. Carbajal*, No. 1154, Sept. Term, 2020, 2022 WL 501090 (Md. Ct. Spec. App. Feb. 18, 2022); *cf. MacDonald v. AutoFlex Inc.*, No. 1312, Sept. Term, 2021, 2023 WL 4068544, at *29 (Md. Ct. Spec. App. June 12, 2023) ("The argument for an extension of the framework set forth in *Anderson* to claims for unpaid commissions under the Maryland Wage Payment and Collection Law appears to be a novel one. This argument, however, was not presented to the circuit court.").

Second, Martinez's argument puts the cart before the horse. "When bringing suit under the FLSA, the employee has the initial burden of proving that she 'performed work for which [she] was improperly compensated and [] produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *McFeeley v. Jackson St. Ent., LLC*, Civ. No. DKC-12-1019, 2015 WL 2100920, at *3 (D. Md. May 5, 2015) (quoting *Anderson*, 328 U.S. at 687), *aff'd*, 825 F.3d 235 (4th Cir. 2016). "The burden then shifts to the employer to rebut the prima facie case by 'com[ing] forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Anderson*, 328 U.S. at 687–88). The burden shifting test set forth in *Anderson* is thus relevant only after a plaintiff has made out a prima facie case—*i.e.*, when she has shown that she performed uncompensated work. *See id.* Martinez, however, has not yet met that initial burden. In light of the definition of "hours of work" and the application of the *de minimis* doctrine under Maryland wage and hour law, whether she can do so is the very question the Court is tasked with answering here. Accordingly, the *Anderson* burden-shifting test is inapplicable at this stage of the litigation.

3. Whether Time in Security Line is "Work"

The Court first addresses whether the time Plaintiff spent in the security lines may be considered "work" under the Maryland Wage Laws. "For purposes of both the MWHL and MWPCL, the word 'employ' 'means to engage an individual to work' and includes 'allowing an individual to work' and 'instructing an individual to be present at a work site.'" *Amaya*, 278 A.3d at 1238 (quoting LE § 3-101(c)). However, "[l]ike the FLSA, the Maryland Wage Laws do not define the terms 'work' or 'compensable work.'" *Martinez*, 338 A.3d at 645 (citing *Amaya v. DGS Constr., LLC*, 278 A.3d 1216 (Md. 2022)). However, Section 09.12.41.10 of the Code of Maryland Regulations ("COMAR") defines "[h]ours of work" as "the time during a workweek that an

individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace." COMAR 09.12.41.10.A; *see also Amaya*, 278 A.3d at 1246.

In *Amaya v. DGS Construction, LLC*, the Supreme Court of Maryland considered actions brought by construction workers "for unpaid wages and overtime wages under the" Maryland Wage Laws "for the time that they waited and traveled between a parking area where their employers directed them to park and a construction site where they performed physical labor," which included "passing through security." 278 A.3d at 1220, 1225, 1227. The court remarked that COMAR 09.12.41.10A's definition of "hours of work" "provides three circumstances under which an employer's requirement results in hours of work for an employee—namely, an employee being required to be (1) on the employer's premises, (2) on duty, or (3) at a prescribed workplace." *Id.* at 1249. The Supreme Court of Maryland observed that given the plain language of the regulation, "it would be inconsistent . . . to require that an employee be engaged in the performance of actual physical labor or the performance of the principal work activities of employment in order to be compensated for hours of work." *Id.* Rather, "it is sufficient that the employer require the employee to be on duty, on the premises, or at a prescribed workplace," and the question of whether such a requirement exists are typically "factual matters to be determined by the trier of fact." *Id.* at 1249–50.

More recently in *Martinez*, the Supreme Court of Maryland noted that "[g]iven [the General Assembly's] decision to pattern the MWHL on the FLSA, we presume that the General Assembly was aware of *Anderson* and its recognition of the applicability of the *de minimis* doctrine in determining whether work is compensable under the FLSA, as well as Congress's acquiescence to that judicial interpretation." *Martinez*, 338 A.3d at 652. "That being the case, had the General

Assembly not intended a *de minimis* rule to apply to the MWHL's provisions . . . , we believe it would have said so." *Id.* (emphasis added). "In particular, the General Assembly likely would have supplied its own definition of 'work" or 'hours worked,' rather than leaving those terms undefined in the MWHL, as the FLSA leaves them undefined." *Id.* Rather, the court concluded that "[b]y repeatedly referencing the FLSA in the MWHL, the General Assembly demonstrated its intent to incorporate the core provisions of the FLSA into the MWHL, including as those provisions had been interpreted by the Supreme Court in *Anderson*." *Id.* That included *Anderson*'s holding "that the 'workweek' includes 'all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace.'" *Id.* (quoting *Anderson*, 328 U.S. at 690–92); *see also id.* at 653 ("COMAR's definition of 'hours of work' is almost verbatim *Anderson*'s description of an FLSA 'workweek.'").

Amazon argues that "[i]nsofar as Plaintiff's claims under the MWPCL and MWHL are governed by [COMAR 09.12.41.10.A's] definition of 'hours of work,' she cannot show that she is owed any wages or overtime wages as a matter of law because any additional time spent in security screening, if any, was of her own choosing and not required of her by her employer." ECF 43-1, at 12. By "additional time," Amazon means "time at BWI2 in security screening lines" beyond what Martinez "would have spent walking from the time clock to the exit if there were no security screening apparatus present." *Id.* In addition to the "plain language" of COMAR 09.12.41.10.A, Amazon argues that its conclusion aligns "with United States Supreme Court caselaw in the pre-Portal-to-Portal Act FLSA context holding that employees cannot inflate their compensable time through personal choices." *Id.* at 15–16 (first citing *Anderson*, 328 U.S. at 682–83; and then citing *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944)).

In *Anderson*, the United States Supreme Court described the "statutory workweek" under the FLSA as including "all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace," stating that "the time spent in these activities must be accorded appropriate compensation." 328 U.S. at 690–91. "COMAR's definition of 'hours of work' is almost verbatim *Anderson*'s description of an FLSA 'workweek.'" *Martinez*, 338 A.3d at 653. The United States Supreme Court observed, however, that "compensable working time was limited to the minimum time necessarily spent in walking at an ordinary rate along the most direct route from time clock to work bench." *Anderson*, 328 U.S. at 692. "Many employees took roundabout journeys and stopped off en route for purely personal reasons," and the Court reasoned that "[i]t would be unfair and impractical to compensate them for doing that which they were not required to do." *Id.*[17]

State precedent considering similar wage and hour laws also offer a potentially apt comparison. In a case much like this one, the Pennsylvania Supreme Court considered whether "time spent on an employer's premises waiting to undergo, and undergoing, mandatory security

---

[17] As the Supreme Court of Maryland observed, prior to *Anderson*, "[t]he other two decisions in this early line of Supreme Court FLSA cases were *Tennessee Coal, Iron & Railroad Company v. Muscoda Local No. 123*, 321 U.S. 590 (1944), and *Armour & Company v. Wantock*, 323 U.S. 126 (1944)." *Martinez*, 338 A.3d at 642 n.3. In *Tennessee Coal*, the United States Supreme Court addressed "what constitutes work or employment in underground iron ore mines within the meaning of the" FLSA. 321 U.S. at 591–92. The Supreme Court held that work meant "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598. Less relevant here, *Armour* involved the question of "whether an employer was required to pay overtime to employees for time they 'spent on the employer's premises as fire guards subject to call, but otherwise put to such personal use as sleeping or recreation.'" *Martinez*, 338 A.3d at 642 n.3 (quoting *Armour*, 323 U.S. at 127). The Court held that the FLSA did "not exclude as working time periods contracted for and spent on duty . . . merely because the nature of the duty left time hanging heavy on the employees' hands and because the employer and employee cooperated in trying to make the confinement and idleness incident to it more tolerable." *Armour*, 323 U.S. at 134.

screening is compensable as 'hours worked' within the meaning of the Pennsylvania Minimum Wage Act." *In re Amazon.com, Inc.*, 255 A.3d 191, 192–93 (Pa. 2021).[18] Like the Maryland Wage Laws, the Pennsylvania Minimum Wage Act ("PMWA") does not define "hours worked." *See id.* at 203. Moreover, the Supreme Court of Pennsylvania held that the Pennsylvania state wage law does not incorporate the Portal-to-Portal Act, like the Maryland Wage Laws. *See id.* at 201–02. However, a Pennsylvania regulation defined "[h]ours worked" as "four separate categories of an employee's time": (1) "time during which an employee is required by the employer to be on the premises of the employer"; (2) "[time during which an employee is required by the employer] to be on duty or to be at the prescribed work place"; (3) "time spent in traveling as part of the duties of the employee during normal working hours"; and (4) "time during which an employee is employed or permitted to work." *Id.* at 203 (quoting 34 Pa. Code § 231.1).[19] "[A]ccepting the Sixth Circuit's finding of fact as true that Amazon 'requires' employees to remain on their premises . . . until the security screenings are complete," the Pennsylvania Supreme Court held that "all time spent by the employees waiting to undergo, and undergoing, the security screenings constitutes 'hours worked' within the meaning of Section 231.1 and, thus, within the meaning of the PMWA."[20] *Id.* at 204.

---

[18] The Pennsylvania Supreme Court also considered whether the *de minimis* doctrine applies to its state wage law. *In re Amazon.com, Inc.*, 255 A.3d at 192–93. The text of the Pennsylvania Minimum Wage Act led that court to hold that the *de minimis* doctrine did not apply to claims brought under that act. *See id.* at 193; *Martinez*, 338 A.3d at 653 (distinguishing *In re Amazon.com, Inc.*).

[19] The Pennsylvania regulation "enumerates only two specific employee activities that will be excluded from 'hours worked': 'time allowed for meals ... unless the employee is required or permitted to work during that time', and 'time spent on the premises of the employer for the convenience of the employee.'" *In re Amazon.com, Inc.*, 255 A.3d at 204 n.13.

[20] The Pennsylvania Supreme Court rejected "Amazon's broad contention that only time in which employees are required to be on their premises 'working' – *i.e.*, engaged in duties or tasks directly

The Supreme Court of California has considered similar challenges as well. In *Huerta v. CSI Electrical Contractors*, that court assessed whether "time spent on an employer's premises in a personal vehicle and waiting to scan an identification badge, have security guards peer into the vehicle, and then exit a Security Gate compensable as 'hours worked' within the meaning of" a state wage regulation, Wage Order 16. 544 P.3d 1118, 1122 (Cal. 2024). The Supreme Court of California answered that question in the affirmative. *Id.* Wage Order 16 defined "hours worked" as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.* at 1124 (quoting Cal. Code Regs., tit. 8, § 11160, subd. 2(J)). Under California law, the court explained that the "two clauses" of that definition—the "control clause" and the "suffered or permitted to work clause"—were both satisfied. *Id.* at 1124. With respect to the control clause, the court concluded that the employee "was subject to [the employer's] control 'while awaiting, and during,' the exit security procedure." *Id.* at 1125. Specifically, the court observed that the exit security procedures were "strictly required for every employee," employees "remained confined to the employer's premises" during the procedure, and employees were "required to perform 'specific and supervised tasks'" such as driving up the gate or rolling down their vehicle's window. *Id.* at 1125.[21]

related to the specific requirements of their job or occupation – can constitute 'hours worked' for purposes of the PMWA." *In re Amazon.com, Inc.*, 255 A.3d at 204. Rather, the court held that the "regulation specifically designates *all* 'time during which an employee is required by the employer to be on the premises of the employer' as compensable hours worked, regardless of whether the employee is actually performing job-related duties while on the premises." *Id.* (emphasis in original) (citation omitted).

[21] The court additionally observed that "California's wage and hour statutes do not incorporate the federal *de minimis* doctrine." *Huerta*, 544 P.3d at 1126; *see also Martinez*, 338 A.3d at 653 (citing *Troester v. Starbucks Corp.*, 421 P.3d 1114, 1119–20 (Cal. 2018), and distinguishing California wage orders from Maryland Wage Laws).

*Huerta* was not the first time the Supreme Court of California considered whether a security exit procedure fell under California law's definition of "hours worked." In *Frlekin v. Apple Inc.*, the court "resolve[d] a similar question: whether time that Apple employees spent on Apple's premises 'waiting for, and undergoing, required exit searches of packages, bags, or personal technology devices voluntarily brought to work purely for personal convenience by employees' is compensable as 'hours worked.'" *Huerta*, 544 P.3d at 1124 (internal quotation marks omitted) (quoting *Frlekin v. Apple Inc.*, 457 P.3d 526, 529 (Cal. 2020)). The court noted that the state regulation defining "hours worked" had not been amended to conform to the Portal-to-Portal Act and had "purposely abandoned the narrower standard of compensating only 'required' activities" such that compensable time is that "'during which' employees are 'control[led],' even if such time is not required." *Frlekin*, 457 P.3d at 532–33 (brackets in original). As Amazon argues here, Apple contended that "the exit searches were not compensable because Apple employees could avoid them 'by choosing not to bring a bag, package, or personal Apple technology device to work.'" *Huerta*, 544 P.3d at 1125 (quoting *Frlekin*, 457 P.3d at 533). The court rejected Apple's argument because "[r]edefining the control clause to cover only unavoidably required employer-controlled activities" was both at odds with the provision's text and its "fundamental purpose of protecting and benefitting employees." *Frlekin*, 457 P.3d at 532.[22]

[22] Notwithstanding the "removal of the word 'required' from" the "'hours worked' control clause," the Supreme Court of California still "considered whether an activity is required in determining whether it is compensable." *Frlekin*, 457 P.3d at 536. However, the court concluded "that Apple's exit searches [we]re, as a practical matter, required," because Apple employees had "little genuine choice . . . concerning whether to bring a bag or other receptacle containing such items to work," in part because "it is reasonable to assume that some employees will carry their work uniform or a change of clothes in a bag in order to comply with Apple's compulsory dress code policy." *Id.* at 537.

Similar to Pennsylvania's definition of the term, "hours of work" under the Maryland Wage Laws means "the time during a workweek that an individual employed by an employer is *required by the employer* to be on the employer's premises, on duty, or at a prescribed workplace." COMAR 09.12.41.10.A (emphasis added); *see also In re Amazon.com, Inc.*, 255 A.3d at 192–93 (citing 34 Pa. Code § 231.1). Here, Plaintiff has not "dispute[d] that Maryland law would require Amazon to compensate her only for additional time that she spent in security (beyond the time it otherwise takes to walk out of the facility) because of Amazon's requirements." ECF 59, at 3; *see also* ECF 5; ECF 51.[23] Rather, Martinez's claim under the Maryland Wage Law is based on Amazon's "fail[ure] to compensate the Class for time associated with mandatory security screenings." ECF 5 (complaint), at 5 ¶ 21. In contrast, Amazon argues that that "additional time

[23] It is true that "*Amaya* did not hold that routine exiting of work after having completed one's work responsibilities is compensable time under Maryland law." ECF 43-1, at 13. But that is because *Amaya* addressed a different question—*i.e.*, whether "time spent waiting and traveling from Rosecroft to the MGM Project construction site constituted hours of work and travel from one worksite to another." 278 A.3d at 1250. The Supreme Court of Maryland concluded that there were "genuine disputes of material fact as to whether in using the parking area . . . Petitioners were required to be on Respondents' premises or on duty or at a prescribed workplace." *Id.* The Court has not identified a Maryland case that definitively addresses whether the "routine exiting of work after having completed one's work responsibilities is compensable time" under the Maryland Wage Laws. *See* ECF 43-1, at 13. However, the Court could foresee a reasonable argument that, under the plain language of COMAR 09.12.41.10.A, such an act could be compensable time, at least to the extent that exiting work requires an employee "to be on the employer's premises." And as *Amaya* confirmed, "it would be inconsistent . . . to require that an employee be engaged in the performance of actual physical labor or the performance of the principal work activities of employment in order to be compensated for hours of work." 278 A.3d at 1249. Certainly, a routine exit an employee makes after work may be *de minimis* as a matter of law—but that inquiry would be separate from the question of whether such an exit constitutes otherwise compensable "hours of work" under Maryland law. *See, e.g.*, *Anderson*, 328 U.S. at 691–92 (holding "time necessarily spent by the employees in walking to work on the employer's premises, following the punching of the time clocks," fell within the statutory workweek but noting that "application of a *de minimis* rule" was not precluded "where the minimum walking time is such as to be negligible") (emphasis added). Regardless, Martinez does not challenge the mere act of exiting the premises, only the additional time spent in the security screenings. ECF 5, at 2 ¶ 2; ECF 43-1, at 13; ECF 59, at 3.

spent in security screening," beyond the time ordinarily "spent walking from the time clock to the exit if there were no security screening apparatus present," cannot be considered compensable time because it is not "required." ECF 43-1, at 12. If an employee is engaged in a task that is not required of them on the employer's premises in exiting from work, Amazon contends, then the employer cannot really be said to be requiring the employee to be on the employer's premises during that time. *See id.* Accordingly, the employee is not "required by the employer to be on the employer's premises" and thus is not engaged in "hours of work." *See* COMAR 09.12.41.10; *see also* ECF 43-1, at 12.

The Court agrees with Martinez that, as in *Amaya*, whether Amazon required Martinez to be on the premises ultimately rests on "factual matters to be determined by the trier of fact." 278 A.3d at 1250. First, at this stage, in line with its obligation to refrain from weighing evidence, the Court cannot find as a matter of law that express security lanes resulted in less or no time required to be spent on Amazon's premises. The parties have produced conflicting evidence on this point, and thus the inquiry necessarily hinges on factual and credibility determinations to be made by the trier of fact. *Compare* ECF 43-1, at 12 ("But for Plaintiff's choices, she would have been able to exit under the express lane magnetometer arch in no more time than it took to walk that distance.") *with* ECF 51, at 20 ("[W]hat often occurred was lines across all the turnstiles, including the express lanes, preventing Plaintiff from promptly leaving the premises."); ECF 51-3 (Martinez Dep.) at 16, 88:9–11 ("sometimes, even in the express lane, there would be several people lined up"), at 17, 89:2–8 (Q: "[D]id the express lanes generally have shorter lines than the other lane? . . . A: Well, sometimes we had to form a line but you didn't have to get in line all the time.").

There is also a genuine dispute of fact as to whether making "different choices" would result in effectively avoiding security wait-times. *Compare* ECF 43-1, at 15 ("[B]ut for Plaintiff's

choices, she could have exited the facility without delay[.] . . . [T]he additional time reflected in Plaintiff's records was not time Amazon required her to spend on its premises.") with ECF 51, at 10, (claiming that "a mass exodus at 6:00pm" resulted in "lines in every lane," and furthermore, "even those employees who utilized express lanes were subject to waits from long lines and unanticipated secondary screenings"); ECF 51-3, at 16, 88:9–11, at 17, 89:2–8, at 24, 99:14–16.

Amazon notes that all employees were provided lockers outside of the fulfillment floor along with combination locks, such that no outside items were necessary for the work on the fulfillment floor, and that exemptions to screening were granted to individuals with medical conditions on a case-by-case basis. *See* ECF 43-4, at 22, 147:4–12 (describing lockers as an option for storage of personal items); ECF 51-1, at 15, 121:1–6 ("Certain associates would be granted an exemption from screening. These were case by case, but most commonly associated with medical conditions."). As such, Amazon argues that the Court should conclude as a matter of law that it was the employee's choice to either bring no metallic items and have virtually no wait time upon exiting, or to bring metallic personal items onto the fulfillment floor understanding that such a choice may increase the post-shift security wait time. *See* ECF 43-1, at 5–10. Plaintiff responds that this is a "Hobson's choice." ECF 51, at 22 ("If the choice is to not have your cell phone in the modern world and miss calls with your doctor and/or have personal items unsecured and possibly stolen so an employee uses express lanes instead of divestment lanes, that is not a choice at all.").[24]

---

[24] *See also Hobson's Choice*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/Hobson's%20choice (defining a Hobson's choice as "an apparently free choice when there is no real alternative" and "[t]he necessity of accepting one of two or more equally objectionable alternatives").

Plaintiff cites to *Chavez v. IBP, Inc.*, Civ. No. 01-5093, 2005 WL 6304840, at *29 (E.D. Wash. May 16, 2005) as evidence that courts recognize that a policy that creates "choices" that force an employee to choose "between performing uncompensated work and taking on a significant personal burden" are not meaningful choices at all. In *Chavez*, the Eastern District of Washington held that an employer's argument that employees had "choices" was unpersuasive. *Id.* at *1. There, the plaintiffs were meat packing plant workers seeking pay for donning and doffing equipment required to perform their jobs. *Id.* at *1. The employers, moving to decertify the class, argued that employees (i) could avoid having to remove and replace their equipment for meal breaks; (ii) could avoid pre-shift trips to their lockers by taking their equipment home; and (iii) could choose to use the restroom during paid on-shift time. *Id.* at *2. The court rejected those arguments based on the evidence, finding that: (i) employees were allowed to wear work equipment during meal breaks only if the employee concluded it was not "excessively soiled," so the employee's donning/doffing was not actually "choice" but rather compliance with the employer's restriction, *id.* at *15–16; (ii) although employees technically could keep equipment at home instead of in lockers, this "shift[ed] a large burden to employees who choose to [do so]" because the equipment was "too heavy, wet, dirty, and unwieldy to be reasonably transported on a daily basis," *id.* at *9–11; and (iii) although the employer allowed employees to use the restroom while working on-shift when necessary, it required employees to use the restroom during meal breaks, so employees could not truly "choose" to avoid such meal break donning and doffing time, *id.* at *13-15.

The Supreme Court of California also considered such an argument in *Frlekin*, 457 P.3d at 526. There, the court considered "whether an activity is required in determining whether it is compensable," even though the word "required" had in fact been removed from California's

governing wage order. *Id.* at 536 (also collecting cases "recognizing that 'only genuine choices—and not illusory choices—avoid compensation liability under California's Wage Orders"). The Supreme Court of California agreed that on the existing record, it was "obvious that Apple's exit searches are, as a practical matter, required." *Id.* at 537. There, "Apple require[d] all of its retail store employees to undergo exit searches of their bags, purses, backpacks, briefcases, packages and personal Apple technology devices every day, and any time they wish to leave the store." *Id.* The Court observed that "Apple employees may bring a bag to hold any number of ordinary, everyday items, such as a wallet, keys, cell phone, water bottle, food, or eyeglasses." *Id.* Accordingly, it was "to be expected that many Apple employees feel they have little genuine choice as a practical matter concerning whether to bring a bag or other receptacle containing such items to work." *Id.* Further, "given that Apple requires its employees to wear Apple-branded apparel while working but directs them to remove or cover up such attire while outside the Apple store," the court found it "reasonable to assume that some employees will carry their work uniform or a change of clothes in a bag in order to comply with Apple's compulsory dress code policy." *Id.* Thus, the California Supreme Court concluded that "Apple's proposed rule conditioning compensability on whether an employee can *theoretically* avoid bringing a bag, purse, or iPhone to work does not offer a workable standard, and certainly not an employee-protective one." *Id.* (emphasis in original).

There is no serious comparison that can be made between the plaintiff in *Chavez* having the purported "choice" of going to the lunchroom in soiled and filthy equipment covered in meat and animal remnants (and only if deemed not "excessively spoiled" by the employee), or having the "choice" of carrying heavy, wet, and dirty equipment home every day, with Martinez's choice to carry or not carry her phone on her person during her shift, particularly when a phone was not

an item required for the job. *See* ECF 51-1 at 25, 149:8–13 (noting Amazon never required Plaintiff to bring a cell phone onto the warehouse floor or to make phone calls during their breaks). Martinez attempts to create necessity for personal items by pointing to female hygiene products as necessary items to be carried, and by stating Plaintiff needed to call her doctor occasionally; however, female hygiene products are not metallic, and there is no testimony that such items could not be carried through the express lane without a break in stride. *See also id.* at 24, 148:7–21 (indicating Amazon would provide female hygiene products in any event).

Rather, Plaintiff's choice to bring her phone, keys, sweater, and other items in a bag despite knowing that such a choice would result in wait times in the bag-lane cannot be deemed "required" wait-time by the employer. And unlike in *Frlekin*, there is no evidence on this record that any items were necessary for Martinez to carry onto the warehouse floor—in fact, to the contrary, Martinez concedes that her bag was not necessary. ECF 43-3, at 19–20, 83:22–84:10 (responding "it wasn't necessary but I did," when asked if bringing a bag was needed to perform the work and affirming that Martinez chose to bring a backpack into the work area). Martinez had the choice to carry personal items for her own convenience—not for the benefit of the employer—and there is no basis to conclude that the time Martinez elected to spend on Amazon's premises constitutes time Martinez and others were "required by the employer to be on the employer's premises, on duty, or at a prescribed workplace." COMAR 09.12.41.10A.

Even still, Amazon appears to concede that the express lane and divestment lane may occasionally require an employee to "break their stride." ECF 43-1, at 3 (arguing an employee could walk under an "express lane" magnetometer arch (metal detector) without breaking stride or with, at most, a brief pause). That brief pause would mean that there was not a choice between *not waiting in line* at all and *waiting* in line; rather, there was a choice between wait times in the

various lines. That evidence, if credited, shows that Plaintiff could not avoid waiting some amount of time in the security lines even if she was in the express lane. The parties also disagree as to the effect of secondary screenings on the wait time. *See* ECF 51, at 20 ("Secondary screenings and other delays often occurred in the express lanes."); ECF 50-2, at 16–18, 90:15–91:20 (earrings, watches, keys etc. set off the alarms which caused secondary screenings), at 18, 96:2–3 ("Anything could set the metal [detector] off")). Whether Martinez was required to spend some amount of uncompensated time in a security line, regardless of whether she brought personal items into the secured area, is thus a genuine dispute of material fact and precludes summary judgment.

While the Court agrees with Amazon as a general matter that under the Maryland Wage Laws "employees cannot inflate their compensable time through personal choices" alone, *see* ECF 43-1, at 15, whether Plaintiff did so here is a "factual matter[] to be determined by the trier of fact." *See Amaya*, 278 A.3d at 1249–50. That is, unless such time was *de minimis* as a matter of law, as the Court considers next. *See Martinez*, 338 A.3d at 655.

4. <u>Whether the Time Spent in Security Screening was *De Minimis*</u>

The Supreme Court of Maryland's decision in *Martinez* confirms that the *de minimis* doctrine applies to the Maryland Wage Laws under which Plaintiff brings her claims. *See* 338 A.3d at 655. However, as that court observed, the "answer seemingly begs the additional question: What is the scope of the *de minimis* rule under the Maryland Wage Laws? . . . How a trier of fact should determine whether a particular amount of time worked is or is not *de minimis* under the Maryland Wage Laws remains to be seen." *Id.* at 655 n.13 (emphasis added). Both parties suggest that the Court should rely on the factors articulated by the Fourth Circuit in *Perez v. Mountaire Farms, Inc.* ECF 98, at 8–9; ECF 100, at 4–5. Martinez also suggests that the Court look to a United States Department of Labor regulation from 1961 defining the scope of the *de minimis* doctrine in the FLSA context. ECF 100, at 5 (citing 29 C.F.R. § 785.47 (1961)).

### *i. Background and the* Perez *Factors*

"As the Supreme Court has explained, the *de minimis* rule precludes employees from recovering for compensable work '[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours.'" *Perez*, 650 F.3d at 372 (alteration in original and emphasis added) (quoting *Anderson*, 328 U.S. at 692). "[C]ompensation for '[s]plit-second absurdities' is not justified by the policy of the FLSA." *Id.* (quoting *Anderson*, 328 U.S. at 692). While "the amount of daily time spent on the additional work" is an "important factor in determining whether a claim is *de minimis*" under the FLSA, "[t]here is no precise amount of time that may be denied compensation as *de minimis*." *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984); *see also Lyons v. Conagra Foods Packaged Foods LLC*, 899 F.3d 567, 584 (8th Cir. 2018). However, "[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable." *Lindow*, 738 F.2d at 1063 (collecting cases); *cf. Green v. Planters Nut & Chocolate Co.*, 177 F.2d 187, 188 (4th Cir. 1949) (upholding a district court's grant of summary judgment where a "sign displayed in the plant obviously did not require the workers to be at their places of work ten minutes before starting time," but reasoning that even "if it be supposed, despite the records produced, that the employees were present at their places of work ten minutes before 7 o'clock, and were not paid for this interval, it is obvious that the time spent was negligible so that the *de minimis* rule approved in the *Mt. Clemens* case should be applied" (internal citation omitted and emphasis added)).

However, the Fourth Circuit has expressly rejected "a 'ten-minute rule.'" *Perez*, 650 F.3d at 373 (noting that the observation in *Green*, 177 F.3d at 188, that "the ten-minute interval at issue was *de minimis*" was "merely dicta") (emphasis added). Instead, in *Perez*, the Fourth Circuit for the first time "articulated factors to be considered in determining whether a particular time period

is *de minimis*" under the FLSA. 650 F.3d at 373 (emphasis added). Beyond considering the amount of time spent itself, the Fourth Circuit adopted from the Ninth Circuit "three factors to consider when conducting a *de minimis* analysis: (1) the practical difficulty the employer would encounter in recording the additional time; (2) the total amount of compensable time; and (3) the regularity of the additional work."[25] *Id.* (emphasis added); *see also Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 812 (D. Md. 2014). "By applying these factors," the Fourth Circuit "adopt[ed] a *de minimis* analysis that necessarily requires a factual inquiry that will change on a case-by-case basis."[26] *Perez*, 650 F.3d at 373–74 (emphasis added); *see also Butler*, 55 F. Supp. 3d at 813; *Johnson v. Koch Foods, Inc.*, 670 F. Supp. 2d 657, 672 (E.D. Tenn. 2009) ("[A] determination of what time is *de minimis* is fundamentally factual."); *Hosler v. Smithfield Packing Co., Inc.*, No. 7:07-CV-166-H, 2010 WL 11565558, at *14 (E.D.N.C. Aug. 31, 2010) ("While there may be instances where" the "exact amount of time that may be deemed *de minimis*" can "be determined as a matter of law, . . . where the determination of the time involved is disputed, resolution on summary judgment is not appropriate.") (emphasis added).

---

[25] Other federal circuit courts have applied the same three-factor test in assessing whether otherwise-compensable time is *de minimis* under the FLSA. *See Perry v. City of New York*, 78 F.4th 502, 531 (2d Cir. 2023); *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1042 (10th Cir. 2021).

[26] The Department of Labor regulation Martinez invokes is similar to the three-factor test adopted in *Perez*. Section 785.47 of Title 29 of the Code of Federal Regulations provides that the *de minimis* rule applies "only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities." 29 C.F.R. § 785.47. "An employer may not arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him." *Id.*

The *Perez* court considered whether "the time expended by the employees in donning and doffing" certain protective gear "at the beginning and the end of their work shifts," which involved butchering and processing chickens, was *de minimis*. 650 F.3d at 360, 372. There, "the total time spent donning and doffing at the beginning and end of the workday equal[ed] 10.204 minutes."[27] *Id.* at 372. With respect to the first factor, the Fourth Circuit considered whether the "the time expended" in the activities at issue was "so miniscule that it would be difficult to measure as a practical matter." *Id.* at 374. Because "both experts . . . were able to measure the amount of time required by employees to don and doff" the gear, the court found that the first factor weighed against a *de minimis* determination. *Id.* The court rejected the employer's arguments to the contrary, noting that it "overstate[d] the extent of administrative difficulties involved in the calculation of the time required for donning and doffing" in part because the employer "already ha[d] a timekeeping system that could be modified to include" the activity and could "set policies restricting the employees' nonessential conduct during the donning and doffing process." *Id.* at 374–75.

On the second factor, the Fourth Circuit considered whether "aggregate amount of compensable time involved . . . per employee" was "significant" when compared to the employee's total annual wages. *Perez*, 650 F.3d at 374. The court observed that there were "280 employees" who had opted into the class, each "being paid at a rate of ten dollars per hour" and "entitled to compensation for 10.204 minutes of work per day." *Id.* "Applying these figures to an annual work

[27] The Fourth Circuit observed that the *de minimis* standard does not involving "evaluat[ing] each task or group of tasks separately," an approach which "would undermine the purpose of the FLSA by allowing employers to parcel work into small groups of tasks that, when viewed separately, always would be considered *de minimis*." *Perez*, 650 F.3d at 373 (emphasis added). Rather, the court considered "the aggregate amount of time spent donning and doffing each day at the beginning and the end of the work shifts." *Id.*

schedule of fifty weeks," the court determined that "the amount of compensable time per employee [was] about 42.5 hours per year, which amounts to compensation of about $425 per employee per year." *Id.* The Fourth Circuit concluded that "this annual amount per employee is significant for an employee earning ten dollars per hour, because that annual amount represents a full week's wages." *Id.* The court also observed that the employees were seeking compensation for a six-year period—$2,550 in total—which it also deemed "significant." *Id.*

Finally, regarding the third factor, "the regularity of the additional work," the court observed that it was "undisputed that these activities of donning and doffing at the beginning and the end of the employees' work shifts occur regularly each workday." *Id.* The Court thus concluded that the "time at the beginning and the end of the employees' work shifts is not *de minimis* and, thus, is compensable under the FLSA." *Id.* (emphasis added).

Because both parties agree on the scope of the *de minimis* doctrine and, finding no definitive Maryland authority to the contrary, the Court accepts the factors outlined in *Perez* as an appropriate framework to define the scope of the *de minimis* doctrine under the Maryland Wage Laws.[28]

*ii. Applying the* Perez *Factors*

Amazon contends that each *Perez* factor weighs in its favor, arguing that "there is no question that Plaintiff's time spent in the divestment lane on her way out of the building was *de minimis*." ECF 98, at 9 (emphasis added); *see also* ECF 43, at 19–21. On the first factor, Amazon asserts that although it "has the punch-to-swipe data for each employee, that data does not capture only time spent in a security screening line," and there is "no practical way to segregate out . . .

---

[28] Because the parties agree that the scope of the doctrine includes at least the factors identified in *Perez*, the Court does not wade further into the question of whether additional factors might define the doctrine's scope under Maryland law without the benefit of robust briefing on the matter.

time spent for each specific employee in a specific security screening line." ECF 43, at 19. As for the second factor, regarding time spent in the divestment lane, Amazon asserts that "testimony from Plaintiff and other putative class members who used the divestment lane more frequently makes clear that the time employees spent in the divestment lane was a matter of just seconds." ECF 98, at 9 (citing ECF 98-3, at 20, 117:13–17 (Martinez stating that she could "walk through without stopping")). On the third factor, Amazon argues that the regularity of additional time "is also in Amazon's favor," although its reasoning appears to take the more defensive posture that just because Martinez "was required to spend a few seconds walking through a metal detector at the end of each shift does not foreclose application of the *de minimis* rule where . . . other factors weigh in [Amazon's] favor." ECF 98, at 10–11 (emphasis added) (first citing *Lyons*, 899 F.3d at 584; and then citing *Goodyear Tire & Rubber Co.*, 391 F. Supp. 2d 509 (E.D. Tex. 2005)).

Martinez also argues that each *Perez* factor weighs in her favor. ECF 100, at 6–12; ECF 51, at 31–34. With respect to the first factor, Martinez contends that "Defendant used a highly sophisticated time tracking system that recorded each employee's location within the Maryland fulfillment centers." ECF 100, at 7 (first citing ECF 43-1, at 7; and then citing ECF 74, at 17). Martinez observes that "Amazon fails to cite any evidence demonstrating that its timekeeping system could not have been modified during the Class period to capture the unpaid time at issue," including the "obvious remedy" of moving the timeclocks "directly outside of the magnetometers." *Id.* at 7 (citing ECF 43-1, at 19). On the second factor, Martinez notes that "analysis of the timekeeping and payroll records for Plaintiff demonstrates that she had 9.61 hours of unpaid time during just the 68 shifts she worked during the relevant period representing $161.65 in unpaid wages." *Id.* at 8 (citing ECF 51, at 12, 14 n.7). Finally, Martinez notes that it is "undisputed" that employees "were required to undergo the unpaid, post-shift security screening process every day

on every shift at all three Maryland fulfillment centers throughout the relevant period." *Id.* at 12 (first citing ECF 74, at 3, 17; and then citing ECF 43-1, at 20).

The Court agrees that the *Perez* factors weigh in Plaintiff's favor. Using Martinez's proposed methodology, Amazon's expert, Mr. Nickerson, determined that Plaintiff worked a total of 68 shifts during the relevant period of time, and for 20 of those shifts (29.4% of shifts), it took three minutes or less after clocking out for Plaintiff to exit the facility through the exit turnstile. ECF 43-5, at 2 ¶ 7. For 28 of the remaining 48 shifts (41.2% of shifts), she took between three to five minutes from clocking out to reach the exit turnstile. *Id.* For 11 of the remaining 20 shifts (16.2% of shifts), Plaintiff took between five and eight minutes to exit after clocking out. *Id.* For 6 shifts (8.8% of shifts), Plaintiff took 15 minutes or more to exit after clocking out. Although the majority of screenings Martinez underwent took far under 10 minutes, the Fourth Circuit has expressly rejected such a hard and fast rule regarding *de minimis* time, as noted above. *Perez*, 650 F.3d at 373. Moreover, reviewing the record in the light most favorable to Martinez, the security screenings at issue here do not strike the Court as the kind of "[s]plit-second absurdities" that are *de minimis* as a matter of law, constituting "only a few seconds or minutes." *See Anderson*, 328 U.S. at 692.

Applying the three *Perez* factors, the Court concludes that Martinez's time is not *de minimis* as a matter of law. Regarding the first factor, it appears that Amazon's current timekeeping system could be modified to capture the time employees spend in security screenings, for example by "plac[ing] the punch clocks directly outside of the magnetometers" or by moving the screening area. *See* ECF 51, at 31–32; *see also Perez*, 650 F.3d at 375 ("Mountaire already has a timekeeping system that could be modified to include the time that the employees spend performing these activities."). Although Amazon claims that "it would be administratively

difficult, if not impossible, for Amazon to record any time spent passing through security screening," ECF 43-1, at 19, Amazon's response to Martinez's proposals primarily turns on the objection that such modification would work unfairness on employees because "workers who ignored Amazon's recommendation not to bring personal items on the warehouse floor would receive higher pay than those who followed the recommendation." ECF 59, at 16. But that is a policy argument, rather than an argument about administrative feasibility. Furthermore, as the Fourth Circuit observed in *Perez*, the Court observes here that Amazon "is free to set policies restricting the employees' nonessential conduct" at work. *See* 650 F.3d at 375. If Amazon wishes to avoid such disparities in pay, it may be able to, for example, require employees to use lockers to store bags, or otherwise restrict what items can be brought onto the warehouse floor.

The Court concludes that the second factor is neutral. Calculating damages in the light most favorable to her, the maximum amount Martinez would be owed is $161.65 in unpaid wages, which the Court cannot conclude is insignificant for an employee earning $15.25 per hour. *See* ECF 51-8, at 4; ECF 89, at 12. To be sure, however, the amount is smaller relative to the minimum wage at issue in *Perez*. *See* 650 F.3d at 374. However, the Tenth Circuit has held that workers who experienced two minutes of unpaid time per shift representing $0.48 in unpaid wages, or $125.00 per year or approximately $500 for the entire period at issue, was not *de minimis* for "low[-]wage workers" who earn $13.50, although it ultimately concluded that the second factor did "not weigh in favor of either party." *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1047–48 (10th Cir. 2021). However, the Court concludes that the third *Perez* factor—"the regularity of the additional work"—clearly weighs in favor of Martinez. It is undisputed that from November 2018 through March 2020, employees who exited fulfillment centers passed through a security area on their way out of the building each day. *See* ECF 44-5, at 10; ECF 43-4, at 12;

81:13–18; ECF 50, at 9; ECF 51-1, at 5, 81:3–18, at 15, 121:1–6. Thus, "it is undisputed that these activities . . . occur regularly each workday." *See Perez*, 650 F.3d at 374.

Moreover, "[d]etermining whether or not time is *de minimis* is a fact-specific inquiry that should properly go before a jury when factual disputes exist as to how much time was actually spent." *Garcia v. Vertical Screen, Inc.*, 580 F. Supp. 3d 79 (E.D. Pa. 2022) (citing *Walsh v. E. Penn Mfg. Co.*, 555 F. Supp. 3d 89, 118, Civ. No. 18-1194 (E.D. Pa. Aug. 18, 2021)). This case is no exception. Whether inferences from the punch-to-swipe data accurately represent the amount of time spent in security wait lines, as Martinez alleges, or inaccurately represent the amount of time in security because Martinez could have taken "roundabout ways to the exit," as Amazon alleges, is a factual question, and perhaps also a credibility determination that should be made by the trier of fact rather than the Court at the summary judgment stage. The accuracy of Plaintiff's inferences drawn from the data against the accuracy of Defendant's inferences drawn from the data is a determination that is within the jury's purview. *See Johnson v. Helion Techs., Inc.*, Civ. No. DKC-18-3276, 2022 WL 3043413, at *10 (D. Md. Aug. 2, 2022) ("[C]redibility of the Field Technician Plaintiffs' [testimony] against the credibility and accuracy of [Defendant]'s GPS analysis and its supporting testimony [is a] determination [that] is within the jury's purview, not the court's.").

Because genuine factual disputes abound regarding the length of time that Plaintiff actually spent in the security screenings, summary judgment based on an application of the *de minimis* doctrine is inappropriate at this stage of the litigation.

## IV. CONCLUSION

For the foregoing reasons, Amazon's motion to reconsider class certification is granted, Martinez's motion for class certification is denied, and Amazon's motion for summary judgment is denied.

A separate implementing order will issue.

Dated: October 26, 2026

/s/
Brendan A. Hurson
United States District Judge